**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| DAVID KARDONICK, JOHN DAVID, and MICHAEL CLEMINS, individually and on behalf of all others similarly situated, <br><br>       Plaintiffs, <br><br>   v. <br><br> JPMORGAN CHASE & CO. and CHASE BANK USA, N.A. <br><br>       Defendants. | C. A. No. 1-10-cv-23235-WMH |

**JOINT DECLARATION OF ALLEN CARNEY AND RICHARD M. GOLOMB IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND APPLICATION FOR REIMBURSEMENT OF CLASS REPRESENTATIVES' TIME AND EXPENSES**

Allen Carney and Richard M. Golomb, Settlement Counsel in the matter of *Kardonick et al. v. JPMorgan Chase & Co., et al.* (the "Litigation"), hereby state:

1.      We, Allen Carney of the law firm of Carney Williams Bates Pulliam & Bowman, PLLC ("Carney Williams") and Richard M. Golomb of the law firm of Golomb & Honik, P.C. ("Golomb & Honik") (collectively "Settlement Counsel"), submit this declaration in support of Class Representatives'[1] application, under Federal Rule of Civil Procedure 23(e) and Rule 408 of the Federal Rules of Evidence, for this Court's approval of: (a) the settlement of this litigation (the "Litigation"); (b) the Plan of Allocation of settlement proceeds; (c)  application for an award of attorneys' fees and reimbursement of expenses; and (d) application for an incentive award to the Class Representatives.[2]  On February 11, 2011, this Court appointed Carney Williams and Golomb & Honik as Settlement Counsel in this case.  We are thus familiar with the issues raised, the work that counsel performed on behalf of the Class, and the risks assumed in the prosecution of the litigation.  We have personal knowledge of the matters set forth in this declaration, and if called to testify, could and would competently testify thereto.  Biographical resumes for Carney Williams and Golomb & Honik, along with Kanner & Whitely, LLC; Ku & Mussman, P.A.; and Ademi & O'Reilly, LLP, are attached hereto as components of Exhibits 1-5, respectively.

2.      This declaration discusses the following topics:

(a)      the history of the case, including the work performed by counsel;

(b)      the fairness of the Settlement and the Plan of Allocation;

(c)      the risks Plaintiffs assumed in undertaking this Litigation;

---

[1] Class Representatives are defined to include David Kardonick, John David and Michael Clemins.

[2]  Pursuant to the Court's Preliminary Approval Order, Class Representatives' submissions in support of final approval of the Settlement and Plan of Allocation will be filed on or before August 27, 2011.

      (d)      Settlement Counsel's request for attorneys' fees and reimbursement of expenses; and

      (e)      the application for Incentive Awards for Class Representatives.

## I.   <u>INTRODUCTION</u>

3.     Class Representatives and Settlement Counsel have devoted considerable time, energy, effort and resources to the prosecution of this Litigation.  As a result of these efforts, the parties to this Litigation have reached a settlement (the "Settlement") creating a common fund in the amount of twenty million dollars ($20,000,000) for the benefit of the Class.

4.     The Settlement represents a significant recovery for the Class and is the product of time-consuming, intensive investigation, aggressive litigation and extensive arm's-length negotiations.  More specifically, the Settlement was reached only after Settlement Counsel: (a) conducted an extensive factual investigation; (b) interviewed numerous witnesses; (c) reviewed and analyzed Defendants' regulatory filings, financial reports, marketing materials and client statements; (d) filed a detailed and comprehensive complaint; (e) reviewed and analyzed thousands of pages of documents produced by Defendants; (f) assessed the likelihood of prevailing on any motion to dismiss, motion for class certification, or motion for summary judgment, as well as at trial; (g) analyzed the damages likely to be proven at trial; (h) attended pre-mediation meetings; (i) propounded discovery requests; (j) successfully negotiated at arm's length a favorable Settlement for the Class with the substantial assistance of a highly regarded and experienced mediator; and (k) conducted confirmatory discovery, which included witness interviews.  Furthermore, it is important to note that the early Settlement was possible only as a result of Settlement Counsel's efforts in the recently resolved matter of *Spinelli v. Capital One Bank (USA), N.A. et al*, case no. 8:08-CV-132-T-33 EAJ (M.D. Fla) (the "Capital One

Litigation").  The Capital One Litigation afforded Settlement Counsel significant insight into the payment protection products offered by credit card companies.  This knowledge, the product of more than three years of hard-fought litigation, instructed strategy, negotiations and case valuation in the present Settlement.  *See* discussion at ¶¶ 16 to 19.

5.      As such, the Settlement was negotiated on both sides by experienced counsel with a firm understanding of the strengths and weaknesses of their client's respective claims and defenses as well as the practicalities concerning the numerous risks and obstacles of continued litigation.  It is respectfully submitted that under these circumstances the Settlement should be approved as fair, reasonable and adequate.

6.      The proposed Plan of Allocation of Settlement proceeds, which is set forth fully in the Notice, is fair, reasonable and adequate, and should be approved.

7.      Additionally, the application by Settlement Counsel for an award of attorneys' fees in the amount of 25% of the Settlement Fund and reimbursement of expenses in the amount of $62,676.54 that were reasonably and necessarily incurred in prosecuting this action, is fair and reasonable.   Settlement Counsel committed considerable resources to the Litigation, notwithstanding the significant uncertainty as to whether the Litigation would succeed.  Such litigation risk faced by plaintiffs is exemplified by the United States Supreme Court's recent decision in *AT&T Mobility, LLC v. Concepcion*, 563 U.S. ____ (2011), which has the potential to profoundly impact consumer rights in the compulsory arbitration context.  *See* discussion at ¶ 29. As discussed below, the requested fee falls well within the parameters that are recognized as appropriate in class actions and is justified in light of the benefits conferred upon the Class, the risks undertaken, the quality of representation, and the risks of continued litigation.

4

## II.   BACKGROUND AND HISTORY OF THE LITIGATION

8.      As set forth in the Stipulation, the following three class actions (the "Related Actions") were filed against Defendants beginning on or about September 8, 2010:

(1)   *Kardonick v. JPMorgan Chase & Co., et al.*, No. 1:10-cv-23235-WMH, Southern District of Florida;

(2)   *David v. JPMorgan Chase & Co., et al.*, No. 4-10-cv-1415, Eastern District of Arkansas; and

(3)   *Clemins v. JPMorgan Chase & Co., et al.*, No. 2:10-cv-00949-PJG, Eastern District of Wisconsin.

Settlement Counsel endeavored to settle all pending litigation in the United States relating to the Chase Payment Protection product, and sought inclusion of all counsel of record therein.  In addition to Settlement Counsel, the law firms of Kanner & Whitely, LLC; Ku & Mussman, P.A.; and Ademi & O'Reilly, LLP, were involved in the Litigation.  Each of these law firms has performed valuable work in advancing the interests of the Class, and each has been instrumental in achieving resolution of the claims against Defendants.

9.      Each of the Related Actions was predicated on similar facts and each contained allegations that Chase engaged in breaches of contract, breaches of an implied covenant, and violations of the unfair and deceptive acts and practices statutes of various states, among other matters, in connection with marketing and selling of debt cancellation and suspension products known as "Chase Payment Protector," "Payment Protection," and other monikers offering similar coverage.

10.      On or about November 1, 2010, the Chase Defendants filed a motion to dismiss in *Kardonick v. JPMorgan Chase & Co., et al.*, No. 1:10-cv-23235-WMH, Southern District of Florida.  In their Motion to Dismiss, Defendants argue that Plaintiff Kardonick's state consumer

5

protection claims are not actionable as preempted by federal law, and that Plaintiff Kardonick's other common law claims should be dismissed for failure to sufficiently identify the provision of the contract allegedly breached.   Defendants further argued that Plaintiff Kardonick's unconscionability claim is barred by the statute of limitations.   Plaintiffs anticipate that similar motions would have been filed by Chase in the other Related Actions in the absence of the Settlement.

### A.      Settlement Negotiations

11.      Subsequent to the filing of the Related Actions, counsel for Defendants contacted Settlement Counsel to inquire whether settlement negotiations would be productive.   As a result of this initial inquiry, counsel conducted numerous follow-up telephone conferences, and attended a lengthy pre-mediation meeting in New York, NY with defense counsel and representatives of Defendants.   On November 10 and 11, 2010, the parties engaged in a two-day mediation, facilitated by a reputable and skilled mediator, Jonathan B. Marks, in Washington, D.C.   *See* attached Exhibit 6, Declaration of Jonathan B. Marks.

12.      Prior to and during the mediation process, counsel for the Defendants provided Settlement Counsel access to non-public information and documents regarding the companies and their Payment Protection products.[3]   This exchange, coupled with the extensive investigation

---

[3] Before the mediation, the parties exchange mediation briefs outlining their positions.   Chase also provided documents and data on a wide variety of subjects, including:

- the number of Payment Protector enrollees;
- the average fee paid by enrollees;
- the number of enrollees who requested benefits;
- the number of enrollees who received benefits;
- the number of enrollees who were denied benefits;
- the rate at which benefits were approved;
- the reasons why benefits were denied;
- marketing materials and disclosures provided to Payment Protector enrollees;
- the telemarketing scripts employed by Chase's customer service representatives; and

and research already conducted by Settlement Counsel in the present matter and in the Capital One Litigation, allowed Settlement Counsel to fully assess the strengths, weaknesses and valuation of both Plaintiffs' claims, and the potential defenses available to Defendants. Against this background and with the aid of an experienced mediator, the parties were able to effectively engage in informed, arm's length negotiations. In this regard, the negotiations involved experienced counsel on both sides who vigorously represented their respective parties' position. On the last day of mediation, the parties reached an agreement in principle and executed a Settlement Term Sheet outlining the Settlement. Over the next two weeks, the parties continued negotiations and worked in good faith to use the Settlement Term Sheet to develop written, mutually acceptable settlement papers. Subsequently, on November 22 and 23, 2010, the initial mediation session was followed by a second meeting. On those dates, counsel for all parties met in Washington D.C., and worked to finalize the settlement papers, which led to the execution of the Stipulation of Settlement, dated December 20, 2010.

13. Moreover, to confirm the reasonableness of the Settlement's terms and conditions, Settlement Counsel engaged in confirmatory discovery. This process, which began after the parties executed the Settlement Term Sheet, included reviewing and analyzing thousands of pages of internal documents from Defendants and interviewing the product manager of the Payment Protection program. This lengthy, and at times contentious, interview served to confirm prior representations made by Defendants, and allowed for a discussion and further examination of the information contained in the document production.

14. Additionally, in accord with the terms of the Settlement, Plaintiffs filed an Amended Complaint on behalf of the following class (the "Class"):

- the written disclosures provided to Payment Protector enrollees.

All Chase credit card holders who were enrolled or billed by Chase for a Payment Protection Product[4] at any time between September 1, 2004 and November 11, 2010.  Excluded from the class are all Chase cardholders whose Chase Credit Card Accounts that were enrolled or billed for a Payment Protection Product were discharged in bankruptcy.

15.     The Amended Complaint asserts that Chase engaged in breaches of contract, breaches of implied covenant, and violations of the Truth in Lending Act of 1968, Regulation Z, and unfair and deceptive acts and practices statutes of various states, among other matters, in connection with marketing and selling Payment Protection Products.

## III.     THE CAPITAL ONE LITIGATION

16.     As mentioned in the Introduction to this Joint Declaration, the Capital One Litigation afforded Settlement Counsel significant insight into the payment protection products offered by credit card companies, and a brief discussion is merited here.  This experience instructed strategy, negotiations and valuation in the present Settlement.  Indeed, before initiating the litigation on behalf of Plaintiff Kardonick on September 8, 2010, Settlement Counsel had spent much of the previous three years litigating similar claims to a favorable outcome in the Capital One Litigation.

17.     During the litigation of the claims against Capital One, Settlement Counsel gained a wealth of information about the payment protection product, the ways in which it is administered, and the vernacular of the field.  Settlement Counsel brought that knowledge and experience to bear against Chase, and Chase was most assuredly aware of that fact when its

---

[4] "Payment Protection Product" means the debt cancellation and suspension products offered by Chase, including Chase Payment Protector, Chase Payment Advantage, Account Protection Plan, Total Protection Plan, Account Security Plan, and Chasebusiness card and private label account debt suspension or cancellation products.  "Payment Protection Product" does not include a non-credit product offered by a Chase affiliate.

attorneys, during preliminary discussions of otherwise procedural issues raised the possibility of a global resolution of the dispute.

18.     The lessons learned by Settlement Counsel during the lengthy, and often heated, litigation against Capital One proved valuable during the mediation with Chase.  Building upon their extensive knowledge of the Payment Protection device, attorneys for the Class entered the sessions with a clear idea of the most relevant factors demanding inquiry.  This resulted in a very efficient process, allowing the participants to quickly cut to the crux of the matter.  One thing that was extremely important to Settlement Counsel was Chase's policy with regard to the enrollment into its Payment Protection Plan of persons who could never qualify for benefits – a group known as "*per se* ineligibles" – and Chase was adamant that it did not as a practice subscribe such people into the program.  On the strength of this and other representations – all of which would be tested during confirmatory discovery – the parties agreed in principle to the terms of settlement at the close of two days of hard-fought mediation.

19.     As discussed in ¶13, Settlement Counsel at that point turned to confirmatory discovery, with particular focus on the statements Chase had made during the mediation (such as its assertion regarding the bank's policy for *per se* ineligibles).  Again, Settlement Counsel was able to draw on the efforts against Capital One when requesting documents from Chase, making sure to review crucial documents such as those substantiating the average length of time cardmembers remained enrolled in Payment Protection Products.  At the end of this process – after numerous hours reviewing many thousands of documents and an interview with the officer at Chase ultimately answerable for the Payment Protection Plan – Settlement Counsel confirmed the accuracy of Chase's statements upon which were based the agreement reached at the

mediation.  As a result, the parties on December 21, 2010 jointly moved this Court for preliminary approval of the Settlement.

## IV.  PRELIMINARY APPROVAL OF SETTLEMENT AND NOTICE

20.     On February 11, 2011 the Court signed the Order Preliminarily Approving Class Action Settlement and Providing for Notice (the "Preliminary Approval Order").  Pursuant to the Preliminary Approval Order, a total of 15,139,676 Notices were mailed to members of the Class and their nominees.

21.     The Notice advised members of the Class of the terms of the Settlement, the proposed Plan of Allocation, Class Members' rights with regard to the Settlement, court-approved deadlines, and Settlement Counsel's intention to file an application for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application").  It also stated that a hearing (the "Fairness Hearing") will be held before this Court at 10:30 a.m. on September 9, 2011, at which time the Court will consider the fairness of the Settlement, the Plan of Allocation, and the Fee and Expense Application.

22.     By virtue of that same order, Summary Notice was published in the USA Today National Edition and transmitted over PR Newswire, and copies of the Notice and Proof of Claim forms were posted on the Claims Administrator's website.

23.     The Notice program fairly apprised class members of the terms of the Settlement, the proposed Plan of Allocation, the request for an award of attorneys' fees and costs, and the options available to Class Members.  The Notice program constitutes the best practicable notice available to Class Members, and satisfies all due process requirements.

10

## V.      THE SETTLEMENT AND RISK ANALYSIS OF THE LITIGATION

24.      The Settlement provides for payment of a settlement fund of $20,000,000 in cash for the benefit of the Class, and resolves all claims asserted by Class Representatives and the Class in this Litigation against Defendants.

25.      The Settlement represents a significant recovery for the Class and is the product of time-consuming, intensive investigation, aggressive litigation and extensive arm's-length negotiations.   More specifically, the Settlement was reached only after Settlement Counsel: (a) conducted an extensive factual investigation; (b) interviewed numerous witnesses; (c) reviewed and analyzed Defendants' regulatory filings, financial reports, marketing materials and client statements; (d) filed a detailed and comprehensive complaint; (e) reviewed and analyzed thousands of pages of documents produced by Defendants; (f) assessed the likelihood of prevailing on any motion to dismiss, motion for class certification, or motion for summary judgment, as well as at trial; (g) analyzed the damages likely to be proven at trial; (h) attended pre-mediation meetings; (i) propounded discovery requests; (j) successfully negotiated at arm's length a favorable Settlement for the Class with the substantial assistance of a highly regarded and experienced mediator; and (k) conducted confirmatory discovery, which included witness interviews.   Furthermore, it is important to note that the efficient arrival at Settlement was possible only as a result of Settlement Counsels' efforts in the Capital One Litigation.   The Capital One Litigation afforded Settlement Counsel significant insight into the payment protection products offered by credit card companies.   This knowledge, the product of more than three years of hard-fought litigation, instructed strategy, negotiations and case valuation in the present Settlement.   *See* ¶¶ 16 to 19.

11

26.     As demonstrated herein, Settlement Counsel entered into settlement negotiations after substantial review of public and non public relevant and material documents and with full knowledge of the strengths and weaknesses of Class Representatives' claims as well as the potential defenses available to Defendants.  Moreover, throughout the settlement discussions, Settlement Counsel and Counsel for Defendants vigorously negotiated on their respective clients' behalf.  As such, the settlement negotiations were adversarial and conducted at arm's length.

27.     Further, the Settlement was negotiated with the substantial assistance of highly regarded and experienced mediator Jonathan B. Marks.  The participation of a neutral mediator in the settlement process underscores the fact that the proposed Settlement is fair, reasonable and absent of collusion.  *See* Exhibit 6.

28.     What is more, the $20 million Settlement is an excellent result for the Class, both quantitatively and when considering the risk of a lesser recovery if the case proceeded through dispositive motions and trial.  The Settlement provides members of the Class an immediate benefit without the risks, costs, and delay of further litigation.  Indeed, if the Litigation were to proceed, there would undoubtedly have been additional motions to dismiss, motions for summary judgment and motions *in limine*, motion for class certification, followed by an extended trial that would have involved dozens of witnesses and hundreds (if not thousands) of exhibits.  As such, continuing to litigate against Defendants would mean a sharp and certain rise in litigation costs without any corresponding certainty for a sharp (or any) rise in recovery.  Thus, the benefits of the Settlement fit squarely within the range of reasonableness and clearly outweigh the risks of protracted litigation.

29.     These litigation risks are exemplified by the recent United States Supreme Court's decision in *AT&T Mobility, LLC v. Concepcion*, 563 U.S. ____ (2011).  The *AT&T* decision has significantly impacted the enforceability of consumer arbitration clauses.  It is likely that Defendants here would argue that claims brought by private label Chase cardholders should be dismissed pursuant to the arbitration clause contained in the cardholder agreement.  While Plaintiffs believe the circumstances present at bar would allow them to avoid application of the mandatory arbitration provisions, there can be no guarantee of success.

30.     Moreover, even if Class Representatives were able to prove liability, they faced significant risks with respect to damages.  The Defendants would surely have challenged Class Representatives' damage claims in the context of motions to dismiss and for summary judgment and/or at trial.  Settlement Counsel and counsel for Defendants had extensive discussions concerning damages during the course of settlement negotiations that confirmed the parties' polarized views on this issue.

31.     Further, resolution of the expert issues alone could have required substantial *Daubert* hearings as well as lengthy pre-trial hearings.  The cost of experts over the course of the litigation would have been significant.  Should the case have proceeded to trial, Plaintiffs expected the entire trial to take several weeks.  Moreover, whatever the outcome of trial, appeal certainly would have been taken to the Eleventh Circuit and perhaps even to the United States Supreme Court.  All of the foregoing would have extended the case, thus delaying the ability of the Class to recover for years, if at all, while being extremely expensive for the parties.  Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial and appeals, as well as the associated expense.

32.     The immediate benefit to the Class is significant.  Class members throughout the United States can receive recovery attributable to fees paid for Payment Protection from September 1, 2004 forward, statutes of limitations are waived, defenses to claims are waived, and litigation risks are avoided.

33.     Furthermore, if this action were to proceed to trial, the determination of loss causation and damages would no doubt have involved a battle of the experts with conflicting opinions and testimony.  In this Litigation, the amount of damages Class Representatives legally could recover would have been seriously disputed and hinge on a jury's interpretation of conflicting expert testimony.  Thus, whether Class Representatives would succeed on this point, in the face of Defendants' vigorous opposition, was far from certain.

34.     Notably as well, there can be no certainty that a class would have been certified or that the Class Representatives would have been able to maintain the Class through trial.  For example, Defendants repeatedly advanced the argument that the unique nature of individual cardmember enrollments renders class certification unobtainable.  While Settlement Counsel was confident of certification, there can be no guarantee of success.

35.     In short, continuing to litigate against the Defendants would mean a sharp and certain rise in litigation costs without any corresponding certainty for a sharp (or any) rise in recovery.  Thus, the benefits of the Settlement clearly outweigh the risks of continued litigation and is infinitely better than another possibility - no recovery at all.

36.     In light of the substantial benefits that the Settlement provides to the Class, the substantial risks Plaintiffs faced in establishing liability and damages, as well as the further inherent risks presented by prosecuting a complex class action before a jury, Settlement Counsel

14

believes that the proposed Settlement is clearly fair, adequate and in the best interests of the Class, and deserves this Court's approval.

## VI.    THE FAVORABLE REACTION TO THE SETTLEMENT

37.    Upon preliminary approval of the Settlement, the court-approved Notice was mailed to approximately 15,139,676 members of the Class.  The Notice advised the members of the Class of the Settlement and of their rights in connection therewith, including their rights to exclude themselves or to object to any aspect of the Settlement or Class Counsels' request for attorneys' fees and reimbursement of litigation expenses.  As of the date of this Declaration, some 12 "objections[5]" have been received by Class Counsel, each of which is addressed below.[6] These numbers represent a fraction of one percent of the Settlement Class (.000079%).  As such, Settlement Counsel respectfully submit that the favorable reaction of the Class validates both the extraordinary nature of the Settlement and the reasonableness of Settlement Counsels' fee and expense request.  An appendix prepared by Settlement Counsel detailing each of the responses is attached as Ex. 7.

38.    Of the objections received, seven (7) (docket nos. 82, 91, 200, 232, 244, 294 and an unfiled objection, attached to the Joint Declaration as Exhibit 8) respondents object to the individual amounts to be received by cardholders because they feel they are inadequate.  *See* Exhibit 7.  These seven objections effectively challenge the Settlement for not achieving the ceiling in damages.[7]  However, such a position does not embody the essence of compromise,

---

[5] Several of the 12 "objections" are vague, and indeed may not in fact be objections to the Settlement.  See discussion herein.

[6] In addition to those letters classified as objections, Settlement Counsel received __ responses that seeking exclusion from the Settlement.  Further, as detailed in Exhibit 7.

[7] Docket no. 196 also seeks to opt out, and accordingly, lacks standing to object.  *See Mayfield v. Barr*, 985 F.2d 1090, 1093 (D.C. Cir. 1993) (generally, former class members who opt-out do not have standing to object to class

which is that the "best possible" recovery must be tempered by the risks of further litigation.  *See Canupp v. Sheldon*, Case No. 2:04-cv-260-FTM-99DNF, 2009 U.S. Dist. LEXIS 113488, at *11 (M.D. Fla. Nov. 23, 2009) (noting "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes").  As such, while these objections raise a legitimate interest in achieving the best possible recovery, they do not state a ground for finding the Settlement, which embodies a compromise negotiated at arms' length, deficient.  Additionally, two "objectors" (docket nos. 129 and 274) state that their personal interactions with Defendants were positive. Again, these statements do not provide a basis to deny final approval.  Further, docket no. 293 states "I think the Court should reject the settlement," but offers no discussion in support of an objection.  Similarly, docket no. 297 complains of losses associated with bank overdraft charges, but offers no criticism in support of an objection.

39.     It is important to note that the above-referenced objections to the Settlement were received out of a total mailing of approximately 15 million, representing a fraction of one percent.  *See Lipuma v. Am. Express Co.*, Case No. 04-20314-CIV-ALTONAGA, slip op. at p. 45 (S.D. Fla. Dec. 20, 2005) (noting forty-one (41) objections out of a mailing of approximately 8.8 million "militates in favor of approval").  Second, and as noted above, while Settlement Counsel is mindful that each member of the Settlement Class desires the "best possible" recovery, Settlement Counsel is also mindful that "a jury verdict in [plaintiffs'] favor against the settling Defendant is by no means a certainty." *Biben v. Card*, [1991-1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶96,512 at 92,330 (W.D. Mo. Dec. 10, 1991).  Thus, in harmonizing these two sentiments, Settlement Counsel tempered the "best possible" recovery with the risks of further litigation during the negotiation process.  In doing so, it is Settlement Counsels' informed

settlement.)

belief that the immediate and substantial benefits provided in the Settlement are fair and represent a better option than many potential outcomes in this Litigation. Finally, it must also be noted that the objectors had the choice to opt out of the Settlement and preserve their claims but chose not to do so. Consequently, the small number of objectors have not presented a sufficient basis for this Court to reject the proposed Settlement.

40.     Lastly Settlement Counsel received two "objections" to any award of attorneys' fees and reimbursement of litigation expenses.[8] (Docket Nos. 70 and 196). Docket no. 70 while seeking to participate in the Settlement states, "Its not fair for attorneys to get all the money for themselves." As set forth in detail in the Memorandum in Support of Attorneys' Fees, Settlement Counsel is entitled to an award of fees, and the amount sought here is well within the benchmarks adopted by courts in this circuit and nationwide.

41.     As stated in Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Approval of Service Payments to Class Representatives, based upon the relevant factors, Settlement Counsel are entitled to an award of reasonable fees and expenses.

## VII.   THE CLASS SHOULD BE FINALLY CERTIFIED FOR SETTLEMENT PURPOSES

42.     The Court's Order Preliminarily Approving the Settlement and Providing for Notice preliminarily approved a Class for settlement purposes defined as "a class comprised of all Chase Cardholders who were enrolled or billed for a Payment Protection Product at any time between September 1, 2004 and November 11, 2010. Excluded from the class are all Chase Cardholders whose Chase Credit Card Accounts that were enrolled or billed for a Payment Protection Product were discharged in bankruptcy."

---

[8] As previously noted, the drafter of docket no. 196 lacks standing to object.

43.     The Class amply satisfies the requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3), and warrants final certification by the Court for the purpose of effectuating the Settlement.

**A.       The Class Satisfies the Requirements of Rule 23(a)**

44.     Under Rule 23(a), class certification is appropriate where:

(1)     the class is so numerous that joinder of all members is impracticable,

(2)     there are questions of law or fact common to the class,

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4)     the representative parties will fairly and adequately protect the interests of the class.

The Class in this Litigation easily satisfies each foregoing requirements.

1.     Numerosity

45.     Many courts have determined that the numerosity requirement is satisfied when a proposed class involves at least 40 members.  Plaintiffs need not show that joinder is impossible; impracticability of joinder will suffice.  Here, Settlement Counsel identified some 15 million potential Settlement Class members who were sent the court-approved Notice.  Consequently, the threshold for numerosity is readily met.

2.     Commonality

46.     Rule 23(a)(2) requires that there be common questions of law or fact, not that every question be identical or common. This criterion is satisfied where there is even one single issue common to all members of the Class, and therefore it is easily met in this case.

18

47.     Here, Plaintiffs, and members of the Settlement Class all challenge the same course of conduct of Defendants.  Indeed, Plaintiffs' claims and those of other Settlement Class members all arise from the same body of facts as they were all injured by the same series of misleading and deceptive statements.  In addition, the claims of Plaintiffs and other Settlement Class members arise under identical legal theories.   Accordingly, there are numerous common issues of law and fact in the present case, including:

a)      Whether the Defendants' sales, billing and marketing scheme is fraudulent, deceptive, unlawful and/or unfair;

b)      Whether Chase's common and uniform sales, billing and marketing schemes related to the Payment Protection product constitute a deceptive trade practice;

c)      Whether Plaintiffs and the members of the Class are entitled to restitution of all amounts acquired by Defendants through their common and uniform scheme;

d)      Whether Plaintiffs and the members of the Class are entitled to injunctive relief requiring the disgorgement of all wrongfully collected fees by Chase;

e)      Whether Plaintiffs and the members of the Class are entitled to prospective injunctive relief  enjoining Chase from continuing to engage in the fraudulent, deceitful, unlawful and unfair common scheme as alleged herein; and

f)      Whether Plaintiffs and the members of the Class are entitled to recover compensatory and punitive damages as a result of the Defendants' wrongful scheme.

3.      <u>Typicality</u>

48.     The typicality requirement set forth in Rule 23(a)(3) requires an inquiry into whether the Class Representatives' claims are based upon a legal theory that differs from that upon which the claims of other Class members are based.  "Typical" does not mean identical.

Instead, the questions of law and fact merely need to arise out of the same legal or remedial theory.

49.     Class Representatives' claims are typical of the claims of the members of the Class they seek to represent because Class Representatives, and the Class members each sustained damages arising out of Defendants' wrongful conduct.  The Class Representatives' claims arise from the same course of conduct and are predicated on the same legal theories as the claims of other Class members, thus satisfying Rule 23(a)(3).

>           4.     <u>Adequacy of Representation</u>

50.     The adequacy requirement under Rule 23(a)(4) is designed to ensure that absent class members' interests are fully protected, while serving to uncover conflicts of interest between named plaintiffs and a class.  Demonstrating that the named plaintiffs adequately represent the class requires a showing that: (1) the named plaintiffs have interests in common with, and not antagonistic to, the Class' interest; and (2) plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation.

51.     Here, there are no conflicts between the Class Representatives and the other Class members.  More particularly, the Class Representatives' interests are directly aligned with, and not in conflict with, the interests of the Settlement Class members.

52.     There also can be no dispute that Class Counsel are capable of prosecuting this litigation.  Indeed, Class Counsel have extensive experience in prosecuting securities and consumer fraud class actions.  *See* Exhibits 1-5.

53.     Furthermore, the Settlement is the product of lengthy negotiations with eminently qualified defense counsel.  The aggregate size of the Settlement validates the excellent quality of Settlement Counsel's representation of the Class.

**B.     Predominance of Common Questions and Superiority of the Class Action to Other Methods of Adjudication**

54.     Rule 23(b)(3) authorizes class certification where: (1) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Both of these circumstances are present in this Litigation.

1.      Common Legal And Factual Questions Predominate Over Individual Issues

55.     Here, the issue of Chase's liability is centered on whether representations made by Chase in connection with its Payment Protection program were misleading, deceptive and/or unconscionable, and these issues predominate over any individual issues that theoretically might exist.  *See*, *e.g.*, *Bank One*, 2002 U.S. Dist. LEXIS 8709, at *22 ("The issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue.").  Thus, the evidence needed to prove the claims of all Class members would be substantially the same.  Accordingly, central issues therefore predominate over any individual issues that theoretically might exist in the Litigation.

2.      Superiority of the Class Action to Other Methods of Adjudicating Plaintiffs' Claims

56.     When confronted with a request for settlement-only class certification, it is largely unnecessary for a district court to inquire whether the case, if tried, would present intractable

management problems. Nevertheless, absent class action treatment, the expense of individual litigation of the claims presented in this Litigation would likely prevent Class members from obtaining any recovery of their losses.  Where, as here, each Class member suffered harm, but the possibility and amount of individual recovery may not be sufficient to make individual litigation worthwhile, a class action is the superior method for addressing these claims.

57.   Based on the factors set forth above, the Class amply satisfies the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3), warranting final certification by the Court.

## VIII.   THE PLAN OF ALLOCATION

58.   After the parties reached the proposed Settlement, Settlement Counsel formulated a fair plan of distribution of the Settlement Fund to the Class (the "Plan of Allocation").  If approved, the Plan of Allocation will govern how the proceeds of the Settlement Fund, less appropriate costs, fees, and expenses (the "Net Settlement Fund"), shall be distributed among Class Members who submit valid and timely Proof of Claim forms.

## IX.   SETTLEMENT COUNSEL'S FEE AND EXPENSE APPLICATION

59.   The prosecution of this Litigation was undertaken by Settlement Counsel on an entirely contingent basis.  As compensation for the efforts expended to achieve this outstanding result for the Class, Settlement Counsel now seek fair and reasonable compensation for Settlement Counsel's services.   Specifically, Settlement Counsel respectfully requests an aggregate fee award of 25% of the Settlement Fund, which amounts to $5.0 million, as well as reimbursement of $62,676.54 for their out-of-pocket expenses reasonably incurred in the prosecution of this Litigation.

60.   A summary of each firm's time and expense is attached hereto as Exhibits 1-5.

61.     As shown in detail in Exhibits A-E, Settlement Counsel expended 3344.30 hours resulting in a lodestar of more than $1,912,853.00.   Settlement Counsel also collectively underwrote expenses of $62,676.54 during this period, all of which was at risk in this Litigation. Moreover, Settlement Counsel's experience with dozens of other class action settlements reveals that we can expect to spend several hundred additional hours in settlement administration, which are not reflected in Exhibits 1-5.

62.     The effort expended by Settlement Counsel was significant.   As discussed, Settlement Counsel believes that the persistence and the quality of those efforts were responsible for the superior result achieved for the Class here.

63.     Settlement Counsel also prosecuted the Litigation efficiently.   At all times Settlement Counsel jointly divided responsibilities to prevent duplication of effort.   To the extent Settlement Counsel used unappointed counsel, such was carefully supervised by Settlement Counsel to ensure that the work quality was consistent throughout and that results could be achieved in a timely fashion.

64.     There is no question that had the Settlement not been reached, the factual and legal questions at issue would continue to be the subject of lengthy, complex and highly adversarial litigation.   Numerous issues would be involved in proving liability, damages and loss causation.

65.     The risks of this Litigation are also clear.   Class Representatives faced risks with respect to numerous issues relating to liability and damages.   Presenting these issues to a jury would have involved enormous risk.   All of these issues presented potential obstacles to securing a recovery for the Class absent the Settlement.

66.     In addition, there was substantial risk of a jury verdict for the Defendants, or after judgment for Plaintiffs, an appellate reversal, any of which would have left the Class and Settlement Counsel without any recovery whatsoever.

67.     Settlement Counsel's financial investment in the Litigation was significant – and wholly at risk.  Settlement Counsel understood that they were embarking on a complex, risk-laden, expensive and lengthy litigation with no guarantee of ever being reimbursed, let alone compensated, for the investment of time and money the case would require.  In undertaking that responsibility, Settlement Counsel obligated themselves to ensure that sufficient dollars and attorney resources were dedicated to the prosecution of this Litigation.  Frequently, Settlement Counsel takes contingent cases such as this and, after expending thousand of hours and many thousands of dollars, receive nothing.  The risk of non-payment in complex cases such as this one is real.  Even if one succeeds, there could be changes in the law or unexpected evidence.  It is commonplace for Counsel to have expended thousands of hours in various class actions and to have received nothing for their diligence and expertise in litigating those cases through motion practice, pretrial discovery and trial.[9]

68.     When Settlement Counsel undertook to act for the Class, we were aware that the only way we could be compensated was to achieve a successful result.  We believe we have done so.  Investment of these resources limited our firms' ability to staff other matters and to accept new profit-generating matters.  Risks and consequences of these kinds weigh in favor of the 25%

---

[9]     *See, e.g., Kalish v. Franklin Advisers, Inc.,* 742 F.Supp. 1222 (S.D.N.Y. 1990); *Robbins v. Kroger Properties*, 116 F.3d 1441 (11th Cir. 1997); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990); *Krinsk v. Fund Asset Management, Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Landy v. Amsterdam*, 815 F.2d 925 (1st Cir. 1987); *Spielman v. General Host Corp.*, 402 F.Supp. 190 (S.D.N.Y. 1975),    *aff'd*, 538 F.2d 39 (2d Cir. 1976).

fee sought here.  The Class recovery is not only successful, especially in light of the risks of this complex and unusual litigation, but demonstrably and quite concretely an excellent result.

69.     Settlement Counsel are actively engaged in complex federal civil litigation, particularly the litigation of consumer class actions.  Our experience in the field allowed us to identify the complex issues involved in this case and to formulate strategies to effectively prosecute them. Further, Settlement Counsel were lead counsel in an action against Capital One involving that Company's payment protection product.  This experience was vital to efficiently and effectively litigate claims against Chase.[10]  We believe that our reputations as attorneys who will zealously carry a meritorious case through the trial and appellate levels as well as our demonstrated ability to vigorously develop the evidence in this case placed us in a strong position in settlement negotiations with Defendants.

70.     Defendants here were represented by Covington & Burling, LLP.  Among the top-tier law firms in the country, this firm has dozens of attorneys in its litigation department. Throughout the Litigation, Defendants' counsel unfailingly zeroed in on the weakest elements of the Litigation.  Furthermore, in litigating against the Defendants, Settlement Counsel faced litigants with no meaningful limits on the resources they could mount to defend.

71.     As discussed in more detail in the accompanying fee memorandum, the requested fee of 25% falls well within the range of practice and precedent in this Circuit and throughout the country, where district courts commonly award fees in amounts between 20% and 33% of common funds obtained and multiples of three times lodestar in complex class action cases.

72.     A recent empirical study selected for the 2009 Conference on Empirical Legal Studies at Vanderbilt Law School found that for federal class action settlements in 2006 and

---

[10] *See* discussion of the Capital One Litigation at ¶16-19.

2007, the mean and median fee awards in cases applying a percentage-of-the-settlement method

was approximately 25%.  Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements

and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 838 (2010).

73.     Moreover, the findings of this report is consistent with another study published in

the Journal of Empirical Legal Studies that examined fee awards between 1993-2002.  The study

used published opinion data as well as class action reports data and concluded that the median

fee award in settlements applying a percentage-of-the-settlement method was between 24% and

30%.  Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An

Empirical Study*,  1 J. EMPIRICAL L. STUD 27, 52 (2004).

74.     Accordingly, the requested fee is fair and reasonable.

75.     Moreover, the requested fee is further justified based on a lodestar cross-check.

*See* Fee Memorandum at pp. 8-9.  As previously indicated, collectively, Settlement Counsel have

expended 3344 hours, or $1,912,853.25 in lodestar, in the prosecution and settlement of this

Litigation.  As such, the requested fee award represents a lodestar multiplier of 2.6.

76.     The multiplier requested here -- 2.6 -- is well within the range awarded in class

action litigation.  The multiplier is justified by both the extraordinary recovery achieved and

practice and precedent in similar cases.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 297

F. Supp. 2d 503, 524 (E.D.N.Y. 2003) ("multipliers of between 3 and 4.5 have become

common"), *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998)

(court approved fee equaling a multiplier of 3.97, and noted that "in recent years multipliers of

between 3 and 4.5 have become common").  *See also* 1 Conte, Attorney Fee Awards § 2.06

(1993), p. 39 (multiplier of 5-10); 3 Newberg on Class Actions § 14.03, p. 14-5 and n. 21 (1992)

(citing multipliers of five and ten in "large common fund" cases). These decisions and the decisions cited in the accompanying fee memorandum (at p. 8), show that the multiplier requested is fair.

77. Settlement Counsel's hourly rates are also fair and compare favorably with the rates recently charged by defense counsel, who, moreover, operate without risk of nonpayment. For example, a fee request recently submitted by Skadden, Arps, Slat, Meagher & Flom, LLP bills more than $16 million for 3½ months of work, at partner rates that average $775/hour (and range from $620 to $835) and at associate rates that average $448/hour (and range from $295 to $540), yielding a blended rate exceeding $550 per hour for all attorneys and $486 per hour overall.

78. Public policy considerations are well-stated by the Honorable Denise Cote in her opinion in *In Re WorldCom, Inc. Securities Litigation*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005), where she held:

> Public policy also supports the approval of this fee request. The size of the recovery achieved for the class - which has been praised even by several objectors - could not have been achieved without the unwavering commitment of Lead Counsel to this litigation. Several of the lead attorneys for the Class essentially devoted years of their lives to this litigation, with the personal sacrifices that accompany such a commitment. If the Class Representatives had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class. In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives. After all, this litigation was conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation. While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain.

79. The same applies here. Settlement Counsel's initiative and tenacity in pursuing the claims against the Defendants resulted in the $20,000,000 settlement. Thus, Settlement

Counsel should be rewarded for their singular effectiveness in obtaining the results achieved for the Class.

80.     Settlement Counsel are also requesting reimbursement of their out-of-pocket expenses necessarily incurred and advanced by them in the prosecution of the Litigation in the amount of $62,676.54.  The expenses incurred by Settlement Counsel relate to the costs incurred in connection with litigating an action against well-financed Defendants. As is detailed in Settlement Counsel's individual affidavits (Ex. 1-5), counsel have carefully reviewed each of the expenses to ensure that they accurately reflect costs necessarily incurred in obtaining the Settlement.

81.     The foregoing summary of expenses incurred in the prosecution of the Litigation are described in further detail in the individual exhibits to this Declaration.  These costs do not include the expenses of the Claims Administrator associated with providing Court ordered notice to the Class and administering claims. Those amounts will be separately requested on behalf of the Claims Administrator, after the settlement administration is complete.

82.     Settlement Counsel believe these expenses were reasonably and necessarily incurred and were, in fact, critical to Class Representatives' ability to obtain the recovery here.

83.     In addition, the Notice provided to the members of the Class informed them that Settlement Counsel would seek reimbursement of their expenses incurred in the prosecution of the Litigation of no more than $150,000.  To date, no member(s) of the Class has raised an objection to that request.

84.     The work performed and the results achieved by Settlement Counsel in this Litigation demonstrate the proficiency, commitment and quality of representation provided to

28

Class Representatives and the Class. As such, it is without question that the Settlement was obtained through the diligence, skill, and litigation efforts of Settlement Counsel.

85. Indeed, the experience, dedication, and expertise of Settlement Counsel allowed them to effectively represent the interest of the Class to a favorable resolution. In this regard, Settlement Counsel's firm resumes, attached hereto as components of exhibits A through E, attest to the substantial experience Settlement Counsel has in securities and consumer class actions and provides a summary of the cases and significant recoveries they have litigated and obtained.

86. Settlement Counsel also respectfully petition this Court for a service award in the amount of $2,500.00 for each named Plaintiff. Each Class Representative has been committed to and actively involved in this Litigation from its very inception. Among other things, Class Representatives have (i) reviewed and approved numerous submissions throughout this Litigation, including the Amended Complaint; (ii) had extensive and regular telephonic and email communications with Settlement Counsel, as well as in person meetings, regarding strategy for and developments in the Litigation; and (iii) fully participated in all settlement discussions on behalf of the Class. These are precisely the types of activities Courts have found to support service awards to class representatives. Accordingly, the application of a service award to Class Representatives in the amount of $2,500.00 should be approved.

## X.   **CONCLUSION**

87. In sum, it is the considered and informed judgment of Settlement Counsel, based on all the proceedings to date and their extensive experience in litigating class actions, the Settlement now before the Court is fair, reasonable, adequate and in the best interest of the Class.

As such, and based on fee awards in similar cases, Settlement Counsel respectfully submit that the outstanding recovery achieved and the risks and challenged undertaken by Settlement Counsel warrant the granting of the requested fee and expense award.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 28th day of July, 2011.

_____/s/ Allen Carney_____
Allen Carney


_____/s/ Richard Golomb_____
Richard Golomb