# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

### Case No. 1:10-cv-23235/HOEVELER

DAVID KARDONICK, JOHN DAVID, and
MICHAEL CLEMINS, individually and on
behalf of all others similarly situated and the
general public,

                Plaintiffs,

    v.

JPMORGAN CHASE & CO. and CHASE
BANK USA, N.A.

                Defendants.

## DEFENDANTS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL

Robert D. Wick
Andrew Soukup
COVINGTON & BURLING LLP
Attorneys for Defendants
1201 Pennsylvania Ave. N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 778-5487

Dennis M. Campbell
CAMPBELL LAW FIRM, PLLC
Attorney for Defendants
95 Merrick Way, Suite 514
Coral Gables, Florida 33134
Telephone: (305) 444-6040
Facsimile: (305) 444-6041

TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

BACKGROUND .......................................................................................... 2

    A.    Overview of Chase Payment Protector ........................................ 2

    B.    The Payment Protection Litigation ............................................. 4

    C.    Notice Of and Reactions to the Settlement ................................. 7

STANDARD OF REVIEW ........................................................................... 8

ARGUMENT ............................................................................................. 9

I.    THE SETTLEMENT IS FAIR IN LIGHT OF PLAINTIFFS' UNLIKELY
    PROSPECTS FOR PREVAILING ON THE MERITS ................................. 9

    A.    Chase Has A Strong Preemption Defense. ................................. 10

    B.    Plaintiffs' Claims Lack Value Because Chase's Payment Protection
        Products are Neither Deceptive Nor Misleading. ......................... 14

    C.    Plaintiffs Faced Significant Obstacles In Certifying A Contested Litigation
        Class. ....................................................................................... 16

II.    THE SETTLEMENT IS GENEROUS IN LIGHT OF THE POTENTIAL
    RANGE OF RECOVERY. ....................................................................... 18

III.    THE CLASS'S FAVORABLE REACTION TO THE SETTLEMENT
    SUPPORTS FINAL APPROVAL. ............................................................. 19

IV.    NONE OF THE OBJECTIONS TO THE SETTLEMENT PROVIDE A
    REASON TO DENY FINAL APPROVAL. .................................................. 22

    A.    Several Objectors Lack Standing to Contest This Settlement Because They
        Are Not Class Members. ........................................................... 23

    B.    The Notice Process Was Adequate. ............................................ 24

    C.    Settlements Commonly Release State-Law Claims On a Nationwide Basis. ........ 26

    D.    The Plan For Distributing The Settlement Fund To Class Members Is Fair
        And Reasonable. ...................................................................... 28

    E.    Any Objections Relating To Attorney's Fees Or Incentive Awards To
Class Members Do Not Provide A Reason To Set Aside The Settlement............ 30

CONCLUSION.................................................................................................................... 31

TABLE OF AUTHORITIES

**Page**

**Cases**

*Abat v. Chase Bank USA, N.A.*, 738 F. Supp. 2d 1093 (C.D. Cal. 2010) ..................................... 26

*Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328 (2d Cir. 2006)................................ 25

*Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007)................................................. 25

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)............................................................. 29

*Aramburu v. Healthcare Fin. Servs., Inc.*, No. 02-cv-6535, 2009 WL 1086938
    (E.D.N.Y. Apr. 22, 2009) ....................................................................................................... 23

*Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457 (S.D. Fla. 2002) ........ 9, 26

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................................ 12

*Bacon v. Stiefel Labs., Inc.*, __ F.R.D. __, 2011 WL 2973677 (S.D. Fla. July 21, 2011) ........... 17

*Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194 (11th Cir. 2011)................................ 13

*Barnett Bank of Marion County, N.A. v. Nelson¸* 517 U.S. 25 (1996)........................................ 10

*Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) ............................................................. 9

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)........................................................ 9

*Brotherton v. Cleveland*, 141 F. Supp. 2d 894 (S.D. Ohio 2001)............................................... 21

*Canupp v. Sheldon*, No. 04-cv-260, 2009 WL 4042928 (M.D. Fla. Nov. 23, 2009) ............ 20, 22

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977)......................................................................... 9

*Denton v. Dep't Stores Nat'l Bank*, No. C10-5830, 2011 WL 3298890
    (W.D. Wash. Aug. 1, 2011) ........................................................................................ 10, 11, 12

*Eames v. Nationwide Mutual Ins. Co.*, 412 F. Supp. 2d 431 (D. Del. 2006)............................... 17

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) ........................................... 10

*First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775 (8th Cir. 1990) ......................................... 11

*Gould v. Alleco, Inc.*, 883 F.2d 281 (4th Cir. 1989) ................................................................... 23

*Holmes v. Cont'l Can Co.*, 706 F.2d 1144 (11th Cir. 1983)............................................. 28, 29, 30

*In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418 (S.D.N.Y. 2001)........................ 28

*In re Checking Account Overdraft Litig.*, __ F.R.D. __, 2011 WL 2258458
(S.D. Fla. May 24, 2011) ..................................................................................... 25

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197
(D. Me. 2003)..................................................................................................... 26

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. Apr. 3, 1981) ................... 27

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
No. 3:08-MD-01998, 2009 WL 5184352 (W.D. Ky. Dec. 22, 2009) ........................ 25

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993)........................... 29

*In re Ins. Brokerage Anti. Litig.*, 579 F.3d 241 (3d Cir. 2009)............................................... 28

*In re Montgomery Cnty. Real Estate Antitrust Litig.*, 83 F.R.D. 305 (D. Md. 1979) .................. 24

*In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263 (D. Kan. 2010).............. 30

*In re Pet Foods Prods. Liab. Litig.*, 629 F.2d 333 (3d Cir. 2010) .......................................... 29

*In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24 (1st Cir. 2009) .................... 27

*In re St. Jude Med., Inc.*, 522 F.3d 836 (8th Cir. 2008)...................................................... 18

*In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395 (D. Mass. 2008)........................ 25

*In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000)....................................... 21

*Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178 (3d Cir. 2001) ......................................... 17

*LiPuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ............................. 19, 21, 27

*Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549 (9th Cir. 2010)............................... 13

*Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337 (11th Cir. 2005) ......................... 26

*Mayfield v. Barr*, 985 F.2d 1090 (D.C. Cir. 1993) .......................................................... 23

*Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2010) ............................... 13

*Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221 (S.D. Fla. 2002)............................... 18

*Oshana v. Coca-Cola Co.*, 225 F.R.D. 575 (N.D. Ill. 2005) .............................................. 17

*Parks v. Portnoff Law Assocs.*, 243 F. Supp. 2d 244 (E.D. Pa. 2003)........................................ 20

*Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360 (S.D. Fla. 2007) ............................... 20, 21, 22, 25

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ............................................... 29

*Phillips Petroleum Co. v. Schutts*, 472 U.S. 797 (1985) ................................................ 24

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ................................................... 11

*Rose v. Bank of Am. Corp.*, No. CV 10-5067, Dkt. # 36 (C.D. Cal. Nov. 5, 2010) ............... 11, 12

*Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032 (9th Cir. 2008) ...................................... 12

*Simon v. Toshiba Am.*, No. C 07-06202, 2010 WL 1757956 (N.D. Cal. Apr. 30, 2010) ............ 20

*Spinelli v. Capital One Bank*, 265 F.R.D. 598 (M.D. Fla. 2009) ........................... 11, 12, 13

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) .................................................... 30

*Steiner v. Fruehauf Corp.*, 121 F.R.D. 304 (E.D. Mich. 1988) ...................................... 22

*Taifa v. Bayh*, 846 F. Supp. 723 (N.D. Ind. 1994) ..................................................... 22

*Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996) .......................................................... 12

*Thomas v. Bank of Am. Corp.*, 711 S.E.2d 371 (Ga. Ct. App. 2011) ............................. 11, 12

*United States v. Locke*, 529 U.S. 89 (2000) ............................................................. 10

*Velez v. Novartis Pharm. Corp.*, No. 04-civ-09194, 2010 WL 4877852
    (S.D.N.Y. Nov. 30, 2010) .............................................................................. 16

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.2d 96 (2d Cir. 2005) ........................ 27

*Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956 (3d Cir. 1983) .............................. 28, 29

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007) .................................................. 10

*Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488 (5th Cir. 2003) ......................... 13

*Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281 (11th Cir. 2007) ........................ 17

## Statutes

12 U.S.C. § 24 (Seventh) ................................................................................... 2

6 Del. Code § 2513(a) ........................................................................................ 17

Fla. Stat. Ann. § 501.204 .................................................................................. 17

## Regulations

12 C.F.R. § 37.1 ................................................................................................ 2, 11

12 C.F.R. § 37.6 ................................................................................................ 2, 16

12 C.F.R. § 7.4002 .......................................................................................... 12, 13

12 C.F.R. § 7.4008 ............................................................................................... 12

12 C.F.R. 37.7 ................................................................................................. 2, 16

12 C.F.R. Appendix A .......................................................................................... 2

12 C.F.R. Appendix B .......................................................................................... 2

12 C.F.R. Part 37 ................................................................................................. 10

Debt Cancellation Contracts and Debt Suspension Agreements,
   67 Fed. Reg. 58,962 (Sept. 19, 2002) ............................................................ 11

Preemption Determination and Order, 68 Fed. Reg. 46,264 (Aug. 5, 2003) ................ 12

**Treatises**

*Newberg on Class Actions*, § 11.55 ................................................................... 23

*Newberg on Class Actions*, § 11.58 ................................................................... 22

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants JPMorgan Chase & Co. & Chase Bank USA, N.A. (collectively, "Chase") submit this memorandum in support of the motion for final approval of the Stipulation and Agreement of Class Action Settlement (the "Settlement").

Chase offered its credit card holders the option of purchasing "payment protection" products that suspend or cancel their obligation to repay their credit card debt under certain conditions. Beginning in September 2010, Plaintiffs filed a series of class action lawsuits challenging Chase's marketing and administration of these products. Following extensive informal discovery and hard-fought, arm's-length negotiations supervised by a nationally respected mediator, the parties entered into the Settlement, which provides for Chase to pay $20 million into a settlement fund. This Court issued an order granting preliminary approval to the Settlement in February 2011.

This Court should approve the Settlement for several reasons. As an initial matter, Chase has strong defenses in this case. There is substantial authority supporting Chase's argument that Plaintiffs' claims are preempted by federal law. Furthermore, the information Plaintiffs obtained in informal discovery indicates that Chase's payment protection products do not suffer from the infirmities that are alleged in the Complaint. Plaintiffs also would have faced considerable difficulty in certifying a contested litigation class. In light of these barriers to prevailing on the merits, it was reasonable for Plaintiffs to accept a definite settlement recovery of $20 million to avoid the uncertainties and substantial expenses associated with litigating this case.

The class's overwhelming acceptance of the Settlement also weighs heavily in favor of final approval. Individual notice of the Settlement was given to class members, and

more than 260,000 claims were submitted.   The number of objections before the Court is exceedingly small in relative terms – the objections represent only about 0.000002% of the class – and these objectors have not identified any valid reasons to set aside the Settlement.

## BACKGROUND

**A.     Overview of Chase Payment Protector**

As a federally-charted national bank, Chase is empowered by the National Bank Act to make and collect loans and to exercise "all such incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C. § 24 (Seventh).  One of these "incidental powers" is the power to offer to a consumer, for a fee, a product that cancels or suspends the consumer's obligation to repay a loan upon the occurrence of a specified event.  *See* 12 C.F.R. § 37.1(a).  These products, which the OCC calls "debt cancellation contracts" and "debt suspension agreements," *see id.*, are commonly referred to as "payment protection" products.

As authorized by federal law, Chase offered its credit card holders payment protection products, the best known of which was referred to as "Payment Protector." Subscribers to the product paid a fee of 89 cents per $100 of balance due on their monthly credit card statements in exchange for the right to cancel or suspend their credit card debts under a variety of circumstances.  Most subscribers enrolled in Payment Protector over the telephone, typically when they made their initial calls to Chase to activate their credit cards.  Fink Decl. ¶ 5.[1]  Consistent with the enrollment procedures authorized by federal law, customers who enrolled by phone were read a set of mandatory short-form disclosures before they were permitted to enroll.  *See id.* ¶¶ 5-6; 12 C.F.R. §§ 37.6, 37.7 & Appendices A & B.  Chase then

---

[1]     The Declaration of Marc Fink is attached hereto as Exhibit 1.

mailed these customers a copy of the terms and conditions of the program, and customers were given at least 30 days to cancel their enrollment at no charge. *See* Fink Decl. ¶ 7.

Once enrolled, customers would see a Payment Protector line item on their monthly billing statements in each month in which they incurred a fee for the product. *See id.* ¶ 16 & Ex. 3. Adjacent to this line item was a toll-free telephone number that customers could call to make a benefit claim or to disenroll from the program. *Id.* Subscribers were free to disenroll at any time without penalty. *E.g., id.* ¶¶ 7, 16.

While some banks offer products that provide payment protection only in certain narrowly-defined situations, Chase's product applied in a broad range of circumstances including: (1) business hardship (for the self-employed), (2) involuntary unemployment, (3) disability, (4) hospitalization, (5) marriage, (6) divorce, (7) birth of a child, (8) change in residence, (9) call to military service, (10) death of a spouse or domestic partner, (11) natural disaster, or (12) a once-a-year "payment holiday" selected by the cardholder. *See id.*, Ex. 1, at 7, § 1.1(d). In addition, unlike some other banks, Chase provided debt relief if any of these events affected either the cardholder, the cardholder's spouse or domestic partner, a higher wage earner in the cardholder's household, or an authorized user of the credit card account. *Id.*, Ex. 1, at 7, § 1.1(b). The cardholder's payment obligations would be suspended and no interest or fees would accrue during the suspension period. *Id.*, Ex. 1, at 7, § 1.1(c). Finally, in the event of the cardholder's death, up to $25,000 of any outstanding balance due on the account would be cancelled. *Id.*, Ex. 1, at 7, § 11.

While there are also circumstances in which certain benefits were not available, these situations were clearly disclosed. *See generally id.* For example, the Payment Protector terms and conditions state that self-employed and retired persons "may qualify for all benefits

- 3 -

except for Involuntary Unemployment or a Leave of Absence." *Id.*, Ex. 1 at 7, §§ 9.4, 9.5  These limitations on benefits were disclosed not only in the terms-and-conditions document, but also in a one-page set of responses to Frequently Asked Questions provided to new enrollees. *E.g., id.*, Ex. 2, at 2.

Since January 2005, Chase cardmembers have submitted more than 1.2 million claims for payment protection benefits. *Id.* ¶ 19.  Approximately 90% of these claims were approved. *Id.*  Less than 0.0005% of these claims were denied on the grounds that the cardholder was self-employed or retired. *See id.* ¶ 22.

**B.    The Payment Protection Litigation**

On September 8, 2010, counsel representing the Settlement Class in this case ("Class Counsel") filed a Complaint in this Court directed at Chase's payment protection products. (Dkt. # 1.)  Similar actions were filed in federal courts in Arkansas and Wisconsin. These complaints generally alleged that Chase did not adequately disclose the terms and conditions of the Payment Protector program and that the program was "virtually worthless." (*E.g.*, Dkt. # 1, ¶ 55.)

Chase firmly believes that its payment protection products are lawful and proper. Nevertheless, to avoid the costs of defending its program in lawsuits filed across the country, the distractions imposed by litigation, the burdens of discovery, and the unpredictability of litigation, Chase opted to pursue an early mediation with Class Counsel.

Before the mediation, the parties exchanged mediation briefs outlining their positions.  Chase also provided Class Counsel with documents and information on a wide variety of subjects, including:

- the number of payment protection enrollees;

- the average fee paid by enrollees;

- the number of enrollees who requested benefits;

- the number of enrollees who received benefits;

- the number of enrollees who were denied benefits;

- the rate at which benefits were approved;

- the reasons why benefits were denied;

- marketing materials and disclosures provided to payment protection enrollees;

- the telemarketing scripts employed by Chase's customer service representatives; and

- the written disclosures provided to payment protection enrollees.

Fink Decl. ¶¶ 4-5, 8, 11, 13-17, 19-25.

A two-day mediation occurred in November 2010 under the supervision of Jonathan Marks, a nationally-acclaimed mediator who has mediated (among other disputes) the antitrust litigation between Microsoft and the U.S. Department of Justice. During the mediation, the parties engaged in two days of hard-fought, arm's-length negotiations. Marks Decl. ¶¶ 6-23.[2] After the mediation, Chase provided additional confirmatory discovery to satisfy Class Counsel of the truth of certain representations made at the mediation, and Class Counsel spent several hours interviewing the Chase executive responsible for overseeing Chase's payment protection products. Fink Decl. ¶ 24. These efforts culminated in a final settlement agreement signed in December 2010. (Dkt. # 16.)

Under the Settlement, Chase agreed to pay – and has paid – $20 million into a Settlement Fund from which class members will receive benefits. (Dkt. # 16, § VI.) *All* of these

---

[2]    The Declaration of Jonathan Marks, which was originally filed on March 31, 2011, is attached hereto as Exhibit 2.

funds will be used to provide benefits to the class or to cover settlement costs or attorneys' fees; none of these funds may revert to Chase unless the Settlement is disapproved. (*Id.*, § VI.F.) In exchange, class members agreed to release all claims against Chase arising out of Chase's payment protection products. (*Id.*, §§ II(jj), XIII.)

Mr. Marks has expressed the view, in a declaration that was previously submitted to this Court, that the Settlement is reasonable in light of the strengths and weaknesses of each side's case. Marks Decl. ¶ 23.

A claims-made process will be used to distribute the settlement funds to class members. (*Id.*, §§ VIII, IX; Dkt. # 16-9.) Although Chase believes that none of the class members suffered any actual injury, the class members with the most distinct and palpable *claim* of injury are those who (1) were ineligible for one or more forms of payment protection benefits, (2) allegedly were enrolled without their consent, or (3) were denied a benefit for which they allegedly qualified. Because Chase has no way of identifying these individuals or distinguishing them from the vast majority of class members who (in Chase's view) are satisfied with their payment protection products, a claims process was used to channel larger settlement payments – approximately $122 or $61 – to class members who claim to have suffered one of these forms of injury. (*See* Dkt. # 16-9.) Smaller payments – approximately $31 – will be made to those who were otherwise dissatisfied with the product.[3] (*See id.*)

---

[3]    These payments, which assume all pending motions for compensation from the Settlement Fund are granted, are only estimates. The actual payment depends on the final number and type of claims filed as well as the funds available in the Settlement Fund after the payment of any attorney's fees, incentive award to class members, and settlement administration costs. (*See* Dkt. # 16-9.)

In February 2011, this Court granted preliminary approval of the Settlement and authorized the proposed notice plan.  (Dkt. #'s 23-24.)

C.     **Notice Of and Reactions to the Settlement**

As required by the Court's preliminary approval order and in conjunction with Heffler, Raditch & Saitta LLP, an experienced claims-administration firm, the parties implemented a comprehensive notice program that included five major components: (1) a short-form postcard notice mailed to the last known address of each class member, (2) a settlement website providing class members with comprehensive information about the settlement, (3) notice published in USA Today, (4) a toll-free settlement telephone number, and (5) comprehensive information available by mail for any class members who prefer not to use the settlement website.  (Dkt. # 16, § VIII; Dkt. # 24, ¶¶ 12-13.)   The postcard notice and the publication notice summarized the litigation by describing the allegations of the complaint, alerting class members that the Settlement would bind them unless they opted out, informing class members of their right to opt out or object to the settlement, and explaining how class members could submit a claim.  (*See, e.g.*, Dkt. # 16-4.)  The short-form notice also directed class members to a settlement website where they could obtain detailed information about the Settlement.  (*Id.*); *see also* http://www.kardonicksettlement.com (last viewed Aug. 26, 2011).  Class members who did not have access to the Internet could call or write to the settlement administrator to request a long-form notice (Dkt. # 16-5) and claim form.  *See* Bertino Decl. ¶ 9.[4]

---

[4]     The Declaration of Ronald A. Bertino, C.P.A., was filed in connection with Plaintiffs' memorandum in support of final approval.

More than 15.1 million postcards were mailed to individual class members. *Id.* ¶ 5. In response, class members submitted more than 260,000 claims.[5] *Id.* ¶¶ 12-13. By comparison, fewer than 4,000 people opted out of the Settlement; these opt-outs presumably reflect either satisfaction with Chase's payment protection products or an aversion to class-action litigation, rather than dissatisfaction with the settlement, because the opt-outs have not asserted individual claims against Chase. *Id.* ¶ 11. Only a handful of objections to the Settlement – representing about 0.000002% of the class – were received.

Although more than 275 responses to the Settlement were filed with the Court, very few responses can be called objections.[6] The vast majority of responses consisted of requests to file a claim (*e.g.*, Dkt #'s 72, 175, 316, 327) or requests to opt out of the class (*e.g.*, Dkt #'s 55, 80, 99, 255). These requests were forwarded to the settlement administrator. Consistent with Chase's view that it has not violated any laws, some of class members contacted the Court to say they were satisfied with the product. (*See* Dkt. #'s 129, 274.)

## STANDARD OF REVIEW

Under Rule 23(e), a class action settlement should be approved if it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v.*

---

[5]     Chase understands that, at Class Counsel's request, the settlement administrator will distribute benefits to all class members who file a valid claim on or before the date of the fairness hearing.

[6]     In March 2011, six individuals filed a motion to intervene in this action. (*See* Dkt. # 30.) On April 26, 2011, this Court denied the motion to intervene. (*See* Dkt. # 213.) None of the would-be intervenors have filed an objection to this settlement.

*Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).[7]   The Eleventh Circuit has instructed courts to consider six factors to determine whether a settlement should be approved:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  A court's review of a class action settlement should be "informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement."  *Id.*  "There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex."  *Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002).

## ARGUMENT

**I.    THE SETTLEMENT IS FAIR IN LIGHT OF PLAINTIFFS' UNLIKELY PROSPECTS FOR PREVAILING ON THE MERITS.**

Under the Settlement, Chase agreed to pay $20 million into a fund from which benefits to class members, settlement administrator costs, and attorney's fees are to be distributed. (Dkt. # 16, § VI.)  As explained below, if this case were litigated to trial, Plaintiffs would have to overcome substantial obstacles, including a preemption defense and factual defenses based on the actual features of the products at issue.   Given the strengths and weaknesses of each side's case, the benefits of avoiding uncertainty, and the substantial costs of

---

[7]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted all decisions from the Fifth Circuit published before Sept. 30, 1981 as binding precedent.

litigation, a definite settlement recovery of $20 million is plainly "fair, adequate, and reasonable." Rule 23(e).

### A.    Chase Has A Strong Preemption Defense.

Chase has a strong preemption defense that Plaintiffs would have to overcome to prevail at trial in this case.

In 2002, the Office of the Comptroller of the Currency ("OCC") – the federal agency charged with regulating national banks – issued comprehensive regulations governing the issuance of debt cancellation contracts and debt suspension agreements by national banks. *See* 12 C.F.R. Part 37. These regulations interpret and define the federal authority conferred on national banks under the National Bank Act, a law that has broad preemptive power and scope. *See United States v. Locke*, 529 U.S. 89, 108 (2000). As the Supreme Court has recognized, the "enumerated and incidental powers" granted to national banks under the National Bank Act "ordinarily pre-empt[] contrary state law." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12-14 (2007) (internal quotation marks omitted); *see also Denton v. Dep't Stores Nat'l Bank*, No. C10-5830, 2011 WL 3298890, at *2-5 (W.D. Wash. Aug. 1, 2011) (recognizing that the OCC's debt cancellation regulations are entitled to "a presumption in favor of preemption"). Moreover, regulations interpreting the powers conferred on banks by federal law "have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

The National Bank Act and the OCC's implementing regulations support Chase's argument that Plaintiffs' claims are preempted.

*First*, federal law expressly preempts state law when a federal statute or regulation "reveals an explicit congressional intent to preempt state law." *Barnett Bank of Marion County, N.A. v. Nelson*¸ 517 U.S. 25, 31 (1996). The OCC's 2002 regulations were

"intended to constitute the entire framework for uniform national standards for [debt cancellation contracts] and [debt suspension agreements] offered by national banks." *Debt Cancellation Contracts and Debt Suspension Agreements*, 67 Fed. Reg. 58,962, 58,964 (Sept. 19, 2002).  The regulations therefore provide that "National banks' debt cancellation contracts and debt suspension agreements are governed by this part and applicable Federal law and regulations, *and not by ... State law*."  12 C.F.R. § 37.1(c) (emphasis added).  Courts have relied on this language in other cases to find that claims similar to the ones asserted here are preempted.  *See Denton*, 2011 WL 3298890, at *3-4 (finding state-law consumer protection and unconscionability claims against a national bank preempted); *Thomas v. Bank of Am. Corp.*, 711 S.E.2d 371, 375 (Ga. Ct. App. 2011) (dismissing complaint because federal law preempted state law claims relating to Bank of America's payment protection products); *Rose v. Bank of Am. Corp.*, No. CV 10-5067, Dkt. # 36, at 4-5, (C.D. Cal. Nov. 5, 2010) (same); *Spinelli v. Capital One Bank*, 265 F.R.D. 598, 604-05 (M.D. Fla. 2009) (finding that federal law preempted state law claims relating to Capital One's payment protection products after the date that Capital One became a national bank); *see also First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775, 778 (8th Cir. 1990) (Part 37 preempted claim that payment protection products were subject to state insurance laws).

       *Second*, federal law preempts state law when federal law regulates a given field so thoroughly as to "make reasonable the inference that Congress left no room for the States to supplement it."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  The OCC has determined that its comprehensive set of regulations "occupies the field in [the payment protection] area and imposes uniform, nationally applicable safeguards on national banks offering this product."  *Preemption Determination and Order*, 68 Fed. Reg. 46,264, 46,279 n.99

(Aug. 5, 2003).[8]  Several courts have found that claims like the ones asserted here "are barred by field preemption because the OCC's comprehensive regulations leave no room for state law regarding debt cancellation contracts."  *Rose*, No. CV 10-5067, at 5; *accord Denton*, 2011 WL 3298890, at *4-5; *Thomas*, 711 S.E.2d at 375; *Spinelli*, 265 F.R.D. at 605.

*Third*, other OCC regulations besides Part 37 also support the conclusion that Plaintiffs' claims are preempted by federal law.  For example, 12 C.F.R. § 7.4008(d)(2) provides that "a national bank may make non-real estate loans *without regard to state law limitations* concerning … disclosure and advertising, including laws requiring specific statement, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents."  12 C.F.R. § 7.4008(d)(2) (emphasis added).  Several courts have held that this regulation preempts state-law deceptive practices claims similar to the claims asserted here.  *See, e.g.*, *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1038 (9th Cir. 2008) (holding that California consumer protection law was preempted to the extent it required national banks to include additional disclosures on convenience checks).

Chase's preemption argument is also supported by 12 C.F.R. § 7.4002.  This regulation provides that a national bank "may charge its customers non-interest charges and

_____

[8]      The OCC's interpretation of its own regulations is entitled to judicial deference.  *See, e.g.*, *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation" (internal quotation marks omitted)); *Teper v. Miller*, 82 F.3d 989, 998 (11th Cir. 1996) ("An agency … to which Congress has delegated broad discretion in interpreting and administering a complex federal regulatory regime[] is entitled to significant latitude when acting within its statutory authority, even in its decisions as to the scope of preemption of state law."); *Thomas v. Bank of Am. Corp.*, 711 S.E. 2d 371, 377 (Ga. Ct. App. 2011) (deferring to OCC's interpretation of Part 37's preemptive force).

fees" based upon "business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking practices." 12 C.F.R. § 7.4002(a), (b)(2). Courts have held that this provision preempts attempts to use state law to limit the fees that national banks may charge for their banking services. *See, e.g., Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1197 (11th Cir. 2011) (state law purporting to regulate check-cashing fees preempted because "the significant objective of 12 C.F.R. § 7.4002(a) is to allow national banks to charge fees and to allow banks latitude to decide how to charge them"); *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 556 (9th Cir. 2010) (finding California consumer protection claim alleging that "fees are too high" preempted because OCC regulations "clearly provided" that fee decisions are "business decision to be made by each bank"); *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 284 (6th Cir. 2010) (state regulation limiting the garnishment fees national banks may charge preempted); *Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488, 492 (5th Cir. 2003) (state law prohibiting national banks from charging check-cashing fee preempted).

For the reasons explained above, courts have frequently invoked preemption in dismissing class-action complaints challenging payment protection products offered by national banks. *See Denton*, 2011 WL 3298890, at *4-5; *Thomas*, 711 S.E.2d 371; *Rose*, No. CV 10-5067, at 4-6; *see also Spinelli*, 265 F.R.D. at 604-05 (refusing to certify a class during the period where the defendant was a national bank and observing that "forcing national banks entering into Debt Agreements to comply with the laws of the 50 states would thwart the purpose of the OCC regulations, which are aimed at providing a 'comprehensive Federal consumer protection scheme'" (quoting 67 Fed. Reg. at 58,963)).

In light of Chase's preemption defense, which creates a substantial risk that Plaintiffs would lose on the merits if this case were fully litigated, it was entirely reasonable for Plaintiffs to accept the definite recovery that the Settlement will generate.

**B.     Plaintiffs' Claims Lack Value Because Chase's Payment Protection Products are Neither Deceptive Nor Misleading.**

Putting aside the preemption road-block, Plaintiffs' claims also have questionable value because Chase has a strong argument that its payment protection products in fact do not suffer from the infirmities alleged in the Complaint.

Litigation involving other banks' payment protection products has focused on three issues:  (i) whether the bank made it difficult to obtain payment protection benefits; (ii) whether the bank failed to provide adequate disclosures of the terms and conditions of its products; and (iii) whether the bank enrolled individuals in payment protection products even though those individuals could not qualify for the primary benefits offered by the products.  The facts made available to Plaintiffs during informal discovery do not support their allegation that these concerns apply to Chase's products.

*First*, Plaintiffs allege that Chase makes it so difficult to obtain payment protection benefits that its products are "essentially worthless."  (Am. Compl., Dkt. # 15, ¶ 12.) As Plaintiffs learned during mediation, this claim is groundless.  Over the previous six years, more than 1.2 million requests for benefits have been submitted.  Fink Decl. ¶ 19.  More than 90 percent of these benefit requests were approved.  *Id.*  And although Plaintiffs alleged that Chase often refused to approve benefit requests because an applicant was self-employed or retired (*see* Am. Compl., Dkt. # 15, ¶¶ 44-46), the evidence reveals that just 0.0005% of all benefit requests were not approved for benefits on these grounds.  *See* Fink Decl. ¶ 22.

Chase provides an extremely broad array of benefits that enables cardmembers to obtain benefits based on 12 circumstances:  (1) business hardship (for the self-employed), (2) involuntary unemployment, (3) disability, (4) hospitalization, (5) marriage, (6) divorce, (7) birth of a child, (8) change in residence, (9) call to military service, (10) death of a spouse or domestic partner, (11) natural disaster, or (12) a once-a-year "payment holiday" selected by the cardholder.  Fink Decl., Ex. 1, at 7, § 1.1(d).  In addition, Chase offers relief if any of the covered events affects either the cardholder or various persons connected to the cardholder.  *Id.*, Ex. 1, at 7, § 1.1(b).  As a result, even if the cardholder does not qualify for a particular benefit based on his or her own self-employed or retired status, the cardholder may still qualify based on the status of another person.

These facts contradict the claim that Chase makes it too difficult for Payment Protector enrollees to obtain benefits.

*Second*, Plaintiffs challenged many aspects of Chase's marketing and enrollment practices.  (*See, e.g.*, Am. Compl., Dkt. # 15, ¶¶ 28-41.)  Once again, these claims lack merit. Chase followed the process mandated by OCC regulations when it enrolled customers in payment protection products over the telephone:  it provided an oral set of short-form disclosures about the product – including the fee that would be charged – and it mailed the full terms and conditions following a customer's agreement to enroll.  *See* Fink Decl. ¶¶ 5-7.  Chase provided a standardized script for its customer service representatives to follow when enrolling cardmembers in Chase's payment protection products.  *Id.* ¶ 5-6.  These scripts required customers to provide a clear affirmation of their intent to enroll *after* they had heard the disclosures and *before* any charges would be assessed to their accounts.  *Id.* ¶ 6.  The terms and conditions themselves also clearly and unambiguously identified the circumstances in which

payment protection benefits are available. *Id.* ¶ 9 & Ex. 1. These procedures implemented by Chase to conform its marketing and enrollment practices to OCC regulations undermine Plaintiffs' criticisms of Chase's products.

*Finally*, Plaintiffs' assertion that Chase makes it unreasonably difficult for customers to cancel their enrollment also is unfounded. As required by the OCC and as set forth in the terms and conditions, Chase provides at least 30 days from receipt of the terms and conditions in which customers may cancel their enrollment at no charge. *See id.* ¶ 7; *compare* 12 C.F.R. § 37.6, § 37.7(b). In practice, Chase often refunded cardmembers' payment protection fees if a customer asked to cancel within a longer period after their enrollment. Fink Decl. ¶ 7. All a customer had to do in order to disenroll was to call the toll-free number that appears on each monthly billing statement adjacent to the line-item charge for Payment Protector. *See id.* ¶¶ 7, 16.

In sum, Plaintiffs would have faced significant difficulty in demonstrating that Chase's payment protection products violated state deceptive practices laws. The materials provided to class counsel in informal discovery do not support the allegation that these products, and the manner in which they were marketed and administered, were deceptive and misleading.

## C.    Plaintiffs Faced Significant Obstacles In Certifying A Contested Litigation Class.

The settlement value of Plaintiffs' claims is also low because Plaintiffs would have faced considerable obstacles in seeking to certify a litigation class.

Although there is a "low threshold for certification of a *settlement* class," *Velez v. Novartis Pharm. Corp.*, No. 04-civ-09194, 2010 WL 4877852, at *9-10 (S.D.N.Y. Nov. 30, 2010) (emphasis added), Plaintiffs faced substantial obstacles to the certification of a contested *litigation* class. For example, to prevail on their claims that Chase inadequately disclosed the

terms and conditions of the program, Plaintiffs needed to prove that Chase engaged in a deceptive act or practice and that the deceptive act or practice caused them actual injury. *See, e.g.*, 6 Del. Code § 2513(a); Fla. Stat. Ann. § 501.204; *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (applying Florida UDAP statute); *Eames v. Nationwide Mutual Ins. Co.*, 412 F. Supp. 2d 431, 437 (D. Del. 2006) (applying Delaware UDAP statute). In an attempt to meet this burden, Plaintiffs asserted in their Complaint that they would not have purchased Chase's payment protection products if not for Chase's disclosure failures.

Resolving these allegations presents a host of individualized questions that do not readily lend themselves to class-wide proof. The types of injuries alleged by plaintiffs require inquiry into questions such as what was said to consumers during oral telephone conversations with Chase customer service representatives, consumers' understandings as a result of those conversations, and whether consumers received and read the written disclosures provided by Chase. Courts faced with similar, individualized questions have declined to certify deceptive practices classes. *See, e.g.*, *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 190 (3d Cir. 2001) ("[I]t has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action."); *Bacon v. Stiefel Labs., Inc.*, __ F.R.D. __, 2011 WL 2973677, at *17 (S.D. Fla. July 21, 2011) (concluding that class action was inferior alternative to individual actions because where "Plaintiffs' allegations are predicated on claims of fraud, individual showings of proof are appropriate"); *Oshana v. Coca-Cola Co.*, 225 F.R.D. 575, 586 (N.D. Ill. 2005) (refusing to certify an Illinois consumer fraud class where proof of causation required "an individual analysis of the extent to which [the defendant's] marketing played a role in each class member's decision to purchase" the product at issue), *aff'd*, 472 F.3d 506 (7th Cir. 2006); *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D.

221, 229-30 (S.D. Fla. 2002) (refusing to certify Florida deceptive practices claims where claims would require "mini-trials for each putative class member on the issue of causation"); *see also In re St. Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008) (observing that defendants are entitled to prove an absence of causation and injury by proving a lack of reliance, and declining to certify a class where individualized evidence existed that might disprove reliance).

For this reason as well, the $20 million that Chase has agreed to pay into the Settlement Fund is more than fair and reasonable.

## II.     THE SETTLEMENT IS GENEROUS IN LIGHT OF THE POTENTIAL RANGE OF RECOVERY.

Comparisons to a settlement recently approved by another Florida federal district court – in *Spinelli v. Capital One Bank*, No. 08-cv-00132 (M.D. Fla.) – also support the view that the settlement in this case is reasonable and fair to the class.  That case involved a similar class action lawsuit challenging payment protection products offered by another financial institution.

The settlement in *Spinelli* paid each class member who submitted a claim between $15 and $63.  *See Spinelli*, No. 08-cv-00232, Dkt. # 145, Ex. 1, §§ 5-6 (M.D. Fla. Aug. 13, 2010) (settlement agreement).[9]   Class members who submitted claims in this case stand to receive between $31 and $122, depending on the nature of their claim.[10]   *See* Bertino Decl. ¶ 13; Dkt. # 16-9.  The higher range of payments in this case is particularly noteworthy given that Chase

---

[9]       A copy of the *Spinelli* settlement agreement is attached hereto as Exhibit 3.

[10]      This is more than twice the initial projections, which estimated that class members would receive payments in amounts between $15 and $60.  (*See, e.g.*, Dkt. # 16-4.)  The fact that class members who submit claims stand to receive more than initially projected is "an additional benefit" of the Settlement.  *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1383 (S.D. Fla. 2007).

has stronger defenses than the defenses that were available to the defendant in *Spinelli*. Among other differences:

- Chase has a dispositive federal preemption defense for the entire period in suit, while the defendant in *Spinelli* had a preemption defense only for the limited period in which it operated as a national bank.

- There was a colorable argument that the product offered by the defendant in *Spinelli* had no value to self-employed or retired persons. Here, Plaintiffs have no such argument because of the broad array of benefits provided by Chase's product and the variety of ways to qualify for those benefits.

- Very few individuals were denied Chase Payment Protector benefits on the ground that they were self-employed or retired.

- Plaintiffs here have no viable argument that it was difficult to submit a claim, to receive benefits, or to disenroll from Chase's payment protection products.

Accordingly, any comparisons to the settlement in *Spinelli* also weigh in favor of approving this Settlement.

## III. THE CLASS'S FAVORABLE REACTION TO THE SETTLEMENT SUPPORTS FINAL APPROVAL.

The class's support for the Settlement provides yet another reason to grant final approval. "The small number of opt-outs and objections, given the large number of claims filed, militates in favor of approval." *LiPuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) (approving settlement when 8.8 million notices mailed and only 1,159 opt-outs and 41 objections received).

Class members were notified of the Settlement in several ways: (1) by individual notice mailed to the 15 million class members' last known address, (2) by publication notice, and (3) by information provided on a long-form notice at a settlement website, or (4) by mailing detailed information about the Settlement to class members at their request. *See* Bertino Decl. ¶¶ 5-6, 8-10. More than 260,000 claims were submitted. *Id.* ¶ 12. Other courts have previously

approved class action settlements involving claims rates similar to the claims rate in this case. *See, e.g.*, *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007) (approving settlement involving claims rate of 1.2% under identical notice process); *Simon v. Toshiba Am.*, No. C 07-06202, 2010 WL 1757956, at *1 (N.D. Cal. Apr. 30, 2010) (2% claims rate); *Parks v. Portnoff Law Assocs.*, 243 F. Supp. 2d 244, 251 (E.D. Pa. 2003) (approving settlement involving 2.2% claims rate).  The modest claims rate in this case likely reflects the fact – consistent with Chase's view – that Chase's payment protection products are neither deceptive nor misleading. Indeed, several class members wrote to the Court to state that they were extremely satisfied with Chase's payment protection products.  (*See* Dkt. # 129 ("[I]n all of my dealings with JPMorgan Chase, the company has been fair and distinguished."); Dkt. # 274 ("The Payment protection plan I enrolled and paid for worked for me" and "it would be a great injustice to Chase to be sued for trying to help people.")).

          Although more than 275 letters from class members were filed with the Court, very few of these communications can be called "objections."  Some of these letters (*e.g.*, Dkt. # 279, 331, & 349) are miscellaneous communications that have nothing to do with the Settlement or with the payment protection products at issue in this litigation.  *See Canupp v. Sheldon*, No. 04-cv-260, 2009 WL 4042928, at *13 (M.D. Fla. Nov. 23, 2009) (class members cannot ask for "more relief than was encompassed by the allegations in the Complaint").  Additionally, approximately 100 of these letters are requests to file a claim; class counsel and the settlement administrator have ensured that these individuals have been given the opportunity to

submit a claim. Finally, more than 125 of these letters are requests to opt out; these requests have also been forwarded to the settlement administrator.[11]

In the end, fewer than 30 objections – representing approximately 0.000002% of the class – have been lodged against the Settlement. "[A] low percentage of objections points to the reasonableness of a proposed settlement and supports its approval." *LiPuma*, 406 F. Supp. 2d at 1324 (approving settlement when .0005% of class objected); *see also Perez*, 501 F. Supp. 2d at 1381 ("A low percentage of objections demonstrates the reasonableness of a settlement."); *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001) ("[A] relatively small number of class members who object is an indication of the settlement's fairness."). And as described more fully in Part IV, none of these objections provide a reason to set aside the Settlement.

In the words of a another court in this district written under similar circumstances, "the Class has overwhelmingly accepted" the Settlement. *Perez*, 501 F. Supp. 2d at 1382 (approving settlement when 10.3 million notices were mailed out, 120,000 claims were filed, and 100 objections were received). Courts in this district have approved settlements in light of similarly favorable class reactions. *Id.*; *LiPuma*, 406 F. Supp. 2d at 132; *see also In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 355 (E.D.N.Y. 2000) (approving settlement based on small number of opt outs and objections in light of the "huge number of potential Class members and

---

[11]    A total of 3,862 class members have opted out of the settlement.  Bertino Decl. ¶ 11. This accounts for less than 0.0003% of the class.  Because any individual who opts out of the settlement is no longer a class member and lacks standing to object to the settlement, *see Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993), this memorandum does not discuss any objection filed by any individual who also indicated their intent to opt-out of the settlement.

massive nationwide notice"); *Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (approving class settlement even though objectors represented more than 10 percent of the class).

## IV.   NONE OF THE OBJECTIONS TO THE SETTLEMENT PROVIDE A REASON TO DENY FINAL APPROVAL.

Although courts "must carefully consider any opposition to the proposed settlement," the fact that "there may be opposition does not … necessitate disapproval of the settlement." *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 306 (E.D. Mich. 1988).  Rather, courts "must independently evaluate whether the objections being raised establish valid reasons why the proposal might be unfair." *Id.*

Many of the objections are generalized claims that lack factual and legal support or simply claim that the settlement value is too low.  (*See, e.g.*, Dkt. #'s 82, 91, 200, 232, 244, 253, 279, 293, 294, 302, 303, 315, 323, 331, 338, 342, 344.)  These non-substantive objections are entitled to no weight.  *See Perez*, 501 F. Supp. 2d at 1382 ("The lack of substance of the objections also weighs in favor of approving the Settlement."); *Newberg on Class Actions*, § 11.58 ("General objections without factual or legal substantiation carry little weight."). Furthermore, to the extent these objections simply express "general dissatisfaction with the resolution of the case" – for example, by complaining that not enough money was paid into the Settlement Fund – that "does not mean the resolution is not fair, adequate, and reasonable under the circumstances." *Canupp*, 2009 WL 4042928, at *13; *see also Perez*, 501 F. Supp. 2d at 1382 (holding that objectors who simply wanted a "better deal" than provided in the settlement did not warrant rejecting the settlement).

The remaining objections can be grouped roughly under the following headings: (1) the notice provided to the class was inadequate, (2) the Settlement cannot contain a release of state-law claims, (3) the plan for distributing the benefits is flawed, and (4) the requested amount

of attorney's fees and incentive payments to class representatives are too high.  (*See* Dkt. #'s 335, 339, 341, 345, 351, 352, 354, 357.)   As explained more fully below, none of these arguments have merit or provide a reason to deny final approval to the Settlement.

    **A.**    **Several Objectors Lack Standing to Contest This Settlement Because They Are Not Class Members.**

As a preliminary matter, Chase has no record that at least two of the Objectors— Daniel Sibley and Cindy Barginear (Dkt. # 339)—have ever been enrolled in a payment protection product or been responsible for paying payment protector fees.  *See* Fink Decl. ¶¶ 28-29.  Accordingly, these individuals are not members of the class and they have no right to object to the Settlement.  *Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993) ("Those who are not class members, because they are outside the definition of the class or have opted out," lack standing to object to a class-action settlement); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) (noting that "[t]he plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals"); *Newberg on Class Actions*, § 11.55 ("[A]s a general rule, only class members have standing to object to a proposed settlement.").

In addition, four of the other remaining objectors who are represented by counsel –Douglas Paluczak and Chris Schulte (Dkt. # 354); Tom Blanchard (Dkt. # 352); and William McWhorter (Dkt. # 351) – each paid less than $7 in payment protection fees.  Fink Decl. ¶¶ 30-33.  Because the Settlement will pay, at a minimum, about $31 to these class members, depending on the nature of their claim, these objectors actually stand to receive *more* from this Settlement than they ever could recover in actual damages if they pursued separate actions – a factor which weighs in favor of settlement.  *See, e.g., Aramburu v. Healthcare Fin. Servs., Inc.*, No. 02-cv-6535, 2009 WL 1086938, at *4 (E.D.N.Y. Apr. 22, 2009) (approving settlement because, among other reasons, "the class members could very well recover less in damages than

they will receive under the settlement"); *In re Montgomery Cnty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 318 (D. Md. 1979) (approving settlement and observing "this settlement practically ensures that [some class members] will recover at least his actual damages, if not substantially more").

**B.      The Notice Process Was Adequate.**

Even though class members were mailed individual notice of the Settlement and extensive information about the Settlement was available on a settlement website or at a class members' request, some objectors assert that the notice process in this case was inadequate. (*See* Dkt. # 351, at 2). This position lacks merit.

Under Rule 23, class members are only required to be given notice that is the "best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Phillips Petroleum Co. v. Schutts*, 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). The notice provided in this case easily satisfies this threshold. The parties employed a commonly-used notice process in which, among other things, the settlement administrator mailed each class member at their last known address a postcard containing a short-form notice that directed class members to a settlement website. Bertino Decl. ¶¶ 2-5, 7. Among other things, the postcard explained the litigation, defined the class, informed class members of their right to file a claim or to opt-out or object, and directed them to a settlement website for more information about the Settlement. (Dkt. # 16-4.) The settlement website contained copies of the settlement documents, including the Settlement Agreement, a set of frequently-asked-questions about the Settlement, and an electronic claim form. *See* http://www.kardonicksettlement.com (last viewed on Aug. 26, 2011). In addition,

class members could call or write to request a long-form notice or additional information about the settlement.

      This comprehensive notice plan easily satisfies Rule 23's requirements. *See Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328, 338 (2d Cir. 2006) (notice to class "need only contain 'information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class"). The cost-effective notice process employed in this case is commonly used in class action settlements. *See, e.g.*, *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352, at *12-13 (W.D. Ky. Dec. 22, 2009) (approving of notice plan consisting of publication notice, detailed notice on a settlement website, and a summary postcard notice); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 383 (C.D. Cal. 2007) (approving notice plan that included postcard notices, publication in national newspapers, and a settlement website). Two other courts in this district have approved virtually identical notice plans. *See In re Checking Account Overdraft Litig.*, __ F.R.D. __, 2011 WL 2258458, at *6-8 (S.D. Fla. May 24, 2011); *Perez*, 501 F. Supp. 2d at 1375-77.

      Notably, upon approval, the Settlement in this case does not permit *any* of the Settlement funds to revert to Chase. *Contra In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 405 (D. Mass. 2008) ("[I]n a reversionary common fund claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees."). Thus, the parties had no incentive to provide ineffective notice to the class. Furthermore, any additional notice would have come out of the Settlement Fund and would have unnecessarily depleted funds that otherwise would be distributed to class members. The notice plan in this case thus provided the "best practicable" notice in a cost-effective manner. Because "[t]he contents of the

notices provided class members with sufficient information to make an informed and intelligent decision about whether to file a claim, seek exclusion from the class, or object to the proposed settlement," *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 204 (D. Me. 2003), the notice provided here was adequate.

**C.     Settlements Commonly Release State-Law Claims On a Nationwide Basis.**

Certain Objectors also take issue with the fact that the Settlement includes a nationwide release of all state law claims.  (*See* Dkt. #'s 335, at 1; 345, at 3; 357, at 4-6.)  These Objectors effectively suggest that a named representative from each state is necessary to release the state-law claims of class members in all 50 states.  This is not the law.

*First*, Objectors ignore that the relevant debt cancellation agreements contain a Delaware choice-of-law provision.  (*See, e.g.*, Dkt. # 11-3, at 1, § 18.)  In addition, the underlying credit card agreements include a Delaware choice-of-law provision.  (*See, e.g.*, Dkt. # 11-1, at 4, § 26.)  Under settled law, these choice-of-law provisions are valid and enforceable. *See, e.g., Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005). Accordingly, any state law claims – whether based on consumer protection statues or common law – must be brought under the laws of Delaware, regardless of an individual's state of residence.  *See, e.g., Abat v. Chase Bank USA, N.A.*, 738 F. Supp. 2d 1093, 1095 (C.D. Cal. 2010) (Delaware choice-of-law provision blocked claims of California resident based on California consumer protection law).

*Second*, even if the Delaware choice-of-law provision did not apply, the settlement could still release claims that could be brought under the laws of the 50 states. "[F]ederal class action settlements containing a release of state law claims are both common and presumptively valid."  *Ass'n for Disabled Americans*, 211 F.R.D. at 471 (collecting cases). Contrary to the Objectors' assertions, "releases from state claims are generally reasonable and

the objectors have not pointed to any extraordinary factors dictating different treatment of the state-claim releases here." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 222 (5th Cir. Apr. 3, 1981) (rejecting five arguments why a class action settlement could not release state law claims); *LiPuma*, 406 F. Supp. 2d at 1316 (class action with Florida representative plaintiff permitted to release claims of all U.S. customers of defendant).

Here, Chase "sought to negotiate a global peace, and ensuring that all possible claims arising from" its payment protection products "be included was a critical component of any proposed settlement." *LiPuma*, 406 F. Supp. 2d at 1316.  The court of appeals has explicitly approved of this common practice, observing that "releases from state claims are generally reasonable." *Corrugated Container*, 643 F.2d at 221-22; *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 40-41 (1st Cir. 2009) (approving of decision to certify nationwide settlement class while recognizing consumer-protection laws of some states differed). When, as here, "class members were notified that their state law claims might be released before they had to decide whether to opt out of the class," "a court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint." *Corrugated Container*, 643 F.2d at 221 (internal quotation marks omitted); *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.2d 96, 108 (2d Cir. 2005) ("Class actions may release claims, even if not pled, when such claims arise out of the same factual predicate as settled class claims."). Even in extreme cases where "the court does not have power to adjudicate a claim," this circuit has nonetheless recognized that a court "may still approve release of that claim as a condition of settlement of an action before it." *Corrugated Container*, 643 F.2d at 221 (internal punctuation marks omitted).

**D.      The Plan For Distributing The Settlement Fund To Class Members Is Fair And Reasonable.**

Class members who submit a claim are entitled to receive approximately $31, $61, or $122, depending on the nature of their claim. *See* Dkt. # 16-9; Bertino Decl. ¶ 13; *supra* at 7 n.2. This structure channels the settlement proceeds to class members who have the strongest potential claims for damages. Some objectors take issue with this plan of allocation (*E.g.*, Dkt. #'s 335, at 1; 352, at 2) or go a step further and demand the creation of subclasses for each category of payments (Dkt. # 354, at 8-16.) Neither position has merit.

There is no need to create subclasses in this case because the plan of allocation is "rationally based on legitimate considerations." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983); *see also Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983) ("The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable to all participants in the fund."); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429 (S.D.N.Y. 2001) ("An allocation formula need only have a reasonable, rational basis."). The allocation plan is designed to channel the Settlement Fund to class members who allege the strongest damages claims – those who were denied benefits, those who were ineligible for some benefits, and those who allege that they were enrolled in Chase's debt cancellation products without their consent – while simultaneously ensuring that all class members who submitted a claim receive some payment from the Settlement Fund in exchange for releasing any viable claims against Chase. Courts routinely approve plans of allocation motivated by similar considerations. *See, e.g.*, *In re Ins. Brokerage Anti. Litig.*, 579 F.3d 241, 272 (3d Cir. 2009) (approving of settlement where settlement proceeds were distributed based on strength of damages claim); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 341

(N.D. Ga. 1993) (approving settlement that sought to "assure a modest minimum participation level for each claimant").[12]

The Objectors assert that subclasses are necessary because different class members will receive different benefits. However, it is well established that "differences in settlement value" and "differences in the strength of the various claims" "do not, by themselves, demonstrate conflicting or antagonistic interests within the class that would require subclasses." *In re Pet Foods Prods. Liab. Litig.*, 629 F.2d 333, 346, 347 (3d Cir. 2010); *see also Holmes*, 706 F.2d at 1148 ("[T]here is no rule that settlements benefit all class members equally."); *Walsh*, 726 F.2d at 964 ("[D]isagreements over the proposed division of a settlement fund do not necessarily create conflicts of interest requiring separate representation" because "such rules would place substantial burden on the settlement process."). "[A]lmost every settlement will involve different awards for class members," *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999), and thus "varied relief among class members with differing claims in class settlements is not unusual," *In re Pet Foods*, 629 F.2d at 346.[13]

---

[12] The Objectors mistakenly suggest that this case is akin to *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), where the Supreme Court concluded a settlement class should not be certified when a settlement fund was to be divided between present claimants and future claimants but no class representative adequately represented a subclass of the future claimants. That is not the case here; this Settlement does not include a release of future claims for conduct that occurred after the Memorandum of Settlement was signed on Nov. 11, 2010. (*See* Dkt. # 16, § II(jj).)

[13] The Objectors incorrectly state that "the named plaintiffs in this suit never filed a claim for benefits under the payment protection plan(s)." (Dkt. 354, at 10). Chase's records indicate that Mr. Kardonick initiated a request for benefits but did not receive all the benefits he requested. Fink Decl. ¶ 27.

Tellingly, none of the Objectors have proposed an alternative plan of distribution benefits. The silence is notable considering that the proposed plan for distributing benefits in this case is similar to the plan already approved by the *Spinelli* court. *See Spinelli v. Capital One Bank*, No. 08-cv-132, Dkt. # 145-1, at 11-14, § 5.1 (M.D. Fla.), *attached as* Exhibit 3.

In short, the plan of allocation is "rationally based on legitimate considerations." *Holmes*, 706 F.2d at 1148. For these reasons, the Objectors' contention that subclasses should be created lacks merit and does not provide a reason to deny final approval to the Settlement.

**E.** **Any Objections Relating To Attorney's Fees Or Incentive Awards To Class Members Do Not Provide A Reason To Set Aside The Settlement.**

Several objectors take issue with the proposed amount of attorney's fees (*see* Dkt. #'s 335, at 1; 345, at 2-4; 351, at 2; 352, at 2; 354, at 1-7; 357, at 3-4) or payments to class representatives (Dkt. #'s 335, at 1; 345 at 2). However, these objections do not provide a basis to deny approval to the settlement.

It is well established that the propriety of any attorney's fees or incentive awards to class representatives must be considered apart from the overall fairness of the Settlement. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 970-72 (9th Cir. 2003) (holding that when class counsel applies to the Court for payment of attorney's fees from a settlement fund, the settlement "agreement as a whole does not stand or fall on the amount of fees"); *In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263, 293 (D. Kan. 2010) ("Objections regarding class representative incentive fees would not prevent the Court from approving the proposed settlement."). Indeed, the Settlement specifically provides that any issues associated with these payments "are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of this Settlement Agreement and the Settlement." (Dkt. # 16-1, § VII.B.) For these reasons, any attacks on the Settlement based on the Class Counsel's

- 30 -

request for attorney's fees or payments to the named plaintiffs do not provide a reason to deny approval to the settlement.

## CONCLUSION

For the foregoing reasons, Chase respectfully requests that the Court grant the motion for final approval.

Dated: August 26, 2011

Respectfully submitted,

Robert D. Wick (admitted *pro hac vice*)
Andrew Soukup (admitted *pro hac vice*)
COVINGTON & BURLING LLP
Attorneys for Defendants
1201 Pennsylvania Ave. N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 778-5487

Dennis M. Campbell
CAMPBELL LAW FIRM, PLLC
Attorney for Defendants
95 Merrick Way, Suite 514
Coral Gables, Florida 33134
Telephone: (305) 444-6040
Facsimile: (305) 444-6041

By:    s/ Dennis M. Campbell
       Dennis M. Campbell
       Florida Bar No. 271527
       Email: dcampbell@campbelllawfirm.net

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of August, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By:     s/ Dennis M. Campbell
        Dennis M. Campbell

- 32 -

## Service List

Aggie Vutaj
34 Merrill St.
Rochester, NY 14615-2322

Arlene Hodges
26962 Hwy. 17
Lexington, MS 39095

Betty Eskine
527 Maple Ave
Harvey, LA 70058-4219

Billi Carwile-Campanella
8085 Downing St.
Denver, CO 80229

Brenda Wright
30 Evergreen Ave #206
Hartford, CT 06105

Buena Wright
261 Spencer Dr.
Middletown, CT 06457

Carla Victoria Diaz
14434 Cornishcrest Road Whittier, CA
90604

Catharine R. West
1419 Red Mountain Drive #72
Longmont, CO 80504

Catherine B. Brackett
5572 N. Nantucket
Fresno, CA 93704

Chlorinea Jamison
4953 Woodland Ferry Rd Seaford, DE
19973

Christopher Jestak Beittenmiller
1165 E. Templeton Pl
Town and Country, MO 63017

Cindy Nunn
2145 Country Rd.
Jonesboro, LA 71251-6813

Clark Hampe
4053 Dunhaven Rd.
Dallas, TX 75220-3737

Clyde Cook
106 Smith Hill Loop
West Blocton, AL 35184

Cynthia M. Bracken
17304 Northway Circle
Boca Raton, FL 33496-5909

David C. Disher
1064 Portway Drive Cincinnati, OH
45255

Dennis Everette
11-15 Clinton Street
Apartment #6b
Newark, NJ 07102

Diana K. Buck
4516 Linden Avenue
Mech, PA 17055

Donald T. Murphy
41 Loughlin Rd.
Lot 70
Brighton, NY 13904

Dorothy Brantley
7431 Castleview Ln
Missouri City, TX 77489

Glenda L. Taylor
P.O. Box 765
Tuolumne, CA 95379

Jacqueline M. Sorensen
9 Sylvia Ave
Natick, MS 01760

Janet Sullivan
3080 Crestview Dr.
Prescott, AZ 86301

Javier Cervantes
1963 Keltic Lodge Dr.
Oxnard, CA 93036

John Rice
6109 Ridgeview Avenue Mira
Loma, CA 91752-2233

Jon Marr
28 Smith Street Apt 2 Quincy, MA
02169-4161

Kenneth D. Wright
PO Box 1313
Ponchatoula, LA 70454

Leonard Vidmar
6801 Holcomb Ave
Des Moines, LA 50322

Manijeh Sabi
420 Sand Creek Rd. Apt 609
Albany, NY 12205

Margaret E. Wheeler
572 Herman Nerren Road
Huntington, TX 75949

Mary Watson
717 Barbados Dr. Williamstown, NJ
08094

Melanie Foster
PO Box 1093
Upland, CA 91785

Michael J. Flynn, Jr
12070 Tift Circle
Orlando, FL 32826

Naomi Dickson
PO Box 166
Vian, OK 74962

Pamela Whiteside
4407 Eastridge Dr.
Rockford, IL 61107

Patsy M Loga
PO Box 1313
Ponchatoula, LA 70454

Pavel Guller
1775 West 6 Street
Brooklyn, NY 11223

Preston Eskine
527 Maple Ave
Harvey, LA 70058-4219

Raymond E. Johnson
726 Garrett A. Morgan Blvd
Landover, MD 20785

Richard Jamison
4953 Woodland Ferry Rd
Seaford, DE 19973

Robert Dickerson
87 Darling Street
Central Falls, RI 02863

Robert G Champagne
8 Marie Anne Ct Woonsocket, RI
02895-3922

Rosemarie Venkatram 3044
Third Ave
Apt 4D
Bronx, NY 10451

Saboree Gardhari 14115
18th Avenue Apt #1D
Flushing, NY 11354

Shari M Pace
539 6th Avenue Fl
Fox Island, WA 98333-9740

Stanley R Manske
61454 US Highway 136 Tecumseh,
NE 68450-8009

Stephanie L Diers PO
Box 142
Glencoe, CA 95232

Steven Miller

16772 W 70th Ave
Arvada, CO 80007-7038

Susan M Borden
2194 Main St
Buffalo, NY 14214-2635

Thomas L. Cox , Jr 4934
Tremont
Dallas, TX 75214

Trevor Grant
PO Box 3278
Conroe, TX 77305

Victor Belanger
17 Newton St.
Belmont, MA 02478-3252

Victor F Capurso
37-40 76th Omar
2nd Floor, Rear Room New
York City, NY 11372

Walter Harwood
2918 Arrowhead Dr. Augusta,
GA 30909-2004


William Koths
110 Hankins Hollow Ln.
Tennessee Rdg, TN 37178